David W. Reichel, #018121
Attorney at Law
2700 W. Baseline Rd., Ste. 133, #166
Tempe, AZ 85283
dwr1427@gmail.com
602-361-9995
*Attorney for AWD Farms LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ARIZONA**

IN RE: NILES LIPIN

Debtor and Debtor in Possession,

and

MARIE (MIMI) PIERRON,

Debtor.

-----------------------------------------------

THE PARSONS COMPANY, INC., and THE ESTATE OF ROBERT WALKER and EVE WALKER,

Plaintiffs,

v.

NILES LIPIN and MARIE PIERRON, and AWD FARMS LLC,

Defendants.

CHAPTER 11 PROCEEDINGS

CASE NO. 2:11-bk-26500-GBN

Adversary No. 2:11-ap-02300-GBN

**DEFENDANT AWD FARMS'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST THE PARSONS COMPANY, INC.**
**and**
**THE ESTATE OF ROBERT WALKER and EVE WALKER**

**I. Separate Statement of Facts**

1. On September 20, 2002, Debtor Niles Lipin ("Lipin") sole member AWD Ranch, LLC ("Ranch"), Mimi Pierron ("Pierron") sole member Desert Plants Conservancy, LLC

("DPC"), individually and by and for their respective LLCs, entered into an Agreement and Note for Repayment ("Note for Repayment") with AWD Farms LLC ("Farms") (Exhibit 1) to pursue humanitarian and commercial agricultural projects on 1100 acres of real property ("Land") owned by Ranch and DPC.

2. The Note for Repayment memorializes the Party's agreement and intent that Farms would provide financing in the form of a continuing loan for the various Lipin and Pierron projects. The Note for Repayment states that Lipin and Pierron would be personally liable on the debt. (Exhibit 1 and Exhibit 2, Niles Lipin Affidavit).

3. It was Lipin's understanding and intention that the Note for Repayment would obligate both himself personally and his company for repayment of the Farms Loans. Lipin was also obligated to work 20 hours per week on the projects in an oversight and developmental capacity. (Exhibit 2).

4. From 2002 to 2009 Farms loaned Lipin, Pierron and their respective LLCs in excess of $2,000,000.00. (Exhibit 2).

5. On or about November 18, 2004, co-plaintiff The Parsons Co., Inc., a cattle ranching and land development company ("Parsons") filed suit in Pinal County Superior Court, CV2004-01368, a quiet title action over an easement dispute against R.W. Walker and Eve F. Walker, husband and wife ("Walkers") regarding the Land sold by Walkers to Ranch and DPC. Parsons also sued Ranch and DPC. Almost four years later, on September 18, 2008, Parsons filed its Second Amended Complaint adding one new defendant, Farms, now a defendant in this AP-02300-GBN. (Exhibit 3).

6. On October 31, 2008 Walkers filed a Second Amended Cross-Claim and Third-Party Complaint in CV2004-01368 making allegations against Farms in Count Five (Fraud) and Count Six (Negligent Misrepresentation). (Exhibit 4).

7. On December 1, 2008, Farms sued Ranch, DPC, Lipin, and Pierron personally for breach of contract, CV2008-029422, on the 2002 Note for Repayment. (Exhibit 5).

8. On June 15, 2009, in CV2004-01368, Farms filed a motion for summary judgment alleging that as a lender to Ranch, DPC, Lipin and Pierron for a pond restoration project, Farms had not engaged in any diversion or appropriation of Parsons' water. (Exhibit 6).

9. On or about July 8, 2009, counsel for Parsons called counsel for Farms and stated that Parsons had no defense to the Farms' motion for summary judgment and as such wanted to stipulate to the dismissal of Farms from the case. On or about July 16, 2009, counsel for Farms and Parsons signed and submitted a stipulated dismissal of Farms with prejudice from the Pinal County case. (Exhibit 7).

10. With the dismissal of Farms from the Pinal Case, on or about July 16, 2009, Farms, Ranch, DPC, Lipin and Pierron, with assistance of legal counsel, entered into settlement negotiations resulting in a Stipulated Judgment that was submitted to the Court on July 31, 2009. On or about August 3, 2009 the Court approved the Stipulated Judgment. (Exhibit 8).

11. On or about August 4, 2009 in order to finalize CV2008-029422, Farms, Ranch, DPC, Lipin and Pierron, entered into a Judgment Satisfaction Agreement and on August 5, 2009 agreed to a Supplement of the Judgment Satisfaction Agreement. (Exhibit 9).

12. On September 16, 2011, Lipin and Pierron filed for Chapter 11 relief, Case No. 2:11-bk-26500-GBN and 2:11-bk-26502-GBN, respectively. The Pierron Chapter 11 was converted to a Chapter 7 and discharged. On October 14, 2011, Lipin's bankruptcy counsel filed initial schedules. Schedule D mistakenly listed a secured claim by Farms of $12,686,153.97. On July 13, 2012, special counsel for Debtor discovered the error and amended Lipin's schedules to correctly schedule Farms' claim as unsecured in the amount of $1,686,153.97. (Exhibit 10).

13. Lipin is the sole member of AWD Ranch, LLC (Ranch) and as such has personal knowledge of the circumstances and the facts alleged in the Complaint to disallow, or in the alternative, subordinate AWD Farms' claim. (Exhibit 2).

14. It was Lipin's intention and understanding that the Agreement and Note for Repayment would financially obligate him personally, as well as Ranch. The Note for Repayment also obligated him to 20 hours/week in a supervisory and developmental capacity. Lipin's understanding was that Farms was going to lend money for equipment, supplies, labor, taxes and for all necessary items for each of his projects and that any chattels that became permanently affixed to the properties would become part of the Land and therefore the property Ranch. Any other thing purchased from funds borrowed from Farms remained Farms' property. The only value Ranch was receiving was the value of the resultant permanent fixtures to the Land. (Exhibit 2).

15. Lipin's understanding was that Farms was to be paid back was through income producing businesses/projects. Some of them had humanitarian value as well, but they all

had a business side to them. Although the idea was they would generate positive cash flow, from which half of the money from each project would go to repay the loan to Farms, there was never any positive cash flow so the losses became the joint and several liability of Lipin and Ranch. The first five years of lending Farms agreed not to charge any interest. After that Farms charged interest at the prevailing prime rate. (Exhibit 2).

16. Lipin's intention and understanding was that he personally guaranteed the loan repayment and described it as such in the Agreement and Note for Repayment. The personal guarantee was part of the note. Lipin signed the Note for Repayment in his capacity as member of Ranch however he did not sign it in personal capacity which was an oversight, and counter to the intention of the parties. The parties wrote the Note for Repayment so they knew that it was their intention that Lipin was personally liable on the Farms' loans. (Exhibit 2).

17. Additionally Lipin's understanding was that if either he or Pierron got any large amounts of money from refinancing the property or came into an inheritance, etc., that money would go to Farms to pay them back if the income producing projects were not producing a revenue stream to support themselves and pay Farms back. (Exhibit 2).

18. The 2002 Agreement and Note for Repayment was just a starting point. Farms and Lipin were supposed to go to an attorney and work out a more succinct agreement to cover in greater detail how they could be more secure in their position as a lender. They had discussions about leases and other means of better securing the Note for Repayment, however, Lipin didn't even know if he owned the land because of the title disputes which

ended further work on the agreement. (Exhibit 2).

19. Lipin made an agreement with Farms that he was not going to jeopardize the Farms members by doing things in any ways that would entangle them in a legal sense. Lipin said he would use his best efforts in this sense by using a valid title company and generally adhere to sound procedures to the best of his understanding in developing the land and the proper ways of dealing with the legal issues about the land. He would try to keep the use of the property proper and not cause Farms to be sued for anything. Another part of the agreement was that in the future, if a business became successful, one or more of the members of Farms, and/or others, who sought to enter into that business as an owner could do so. That would be a separate new agreement negotiated between the member who was interested in that particular business/project and Lipin and/or Pierron. (Exhibit 2).

20. The Farms – Lipin et al. understanding was that the Land concept was operated as a joint venture between Lipin and Pierron, with Farms providing loans to finance the projects/businesses. (Exhibit 2).

21. Farms was not physically present on the property most of the time. They had the right to observe, or to have someone out there to protect their interests. Lipin worked on the property to do the development work on the Land, and Pierron was working in the office in Tempe. Farms was kept informed about any of the humanitarian aspects of each project, and if any emergency expenditures were made in Farms' name because they couldn't be there physically. Lipin and/or Pierron kept Farms informed of any

expenditures. (Exhibit 2).

22. Farms was ultimately responsible for the lending of more money for any of the projects even if Lipin initially thought he was going to pay for them out of income. If per chance there was insufficient income, Farms was ultimately going to make up the difference for the cost of the project. This took place fairly quickly because of the financial and legal problems of not having clear title to the property. (Exhibit 2).

23. The parties had discussed that within 3 years if more money would be needed Farms would be paid off via refinancing, but that option went away because of the title issues. (Exhibit 2).

24. Lipin used his credit to purchase tractor and implements. This was intended as a joint ownership situation in that Farms would make the payments in the beginning and then Lipin would pay them back from the income produced by the projects. The projects never produced income so Farms paid for the entire tractor and many other equipment purchases which were initially bought in Farms and Lipin's name. Since Farms fully paid for the tractor, etc., it was agreed and understood that Farms had full ownership of the equipment. (Exhibit 2).

25. In 2007 the pond restoration project intended to have a dual purpose - to restore the ponds for a wildlife riparian area while applying for various state and federal grants, and to harvest the silt and sell it for profit. Because Pierron and Lipin were so delinquent in paying Farms back, their intention was that had the silt deal gone through, all of the money from that sale should be used to repay Farms. Lipin and Pierron were uncertain

how they were going to be able to make that happen with a stop work order on the land and multiple other legal and interference issues happening almost continuously. (Exhibit 2).

26. On their attorney's advice, Farms never entered into any new written contract with Lipin or his LLC because Farms did not want to enter into any other agreement that could potentially pull them into the legal dispute. In the fall of 2007 they contacted Lipin after they met with an attorney who advised them to do another contract. Then about a month later, they talked with different attorney who advised against that. Everything was a verbal agreement after 2003 until they finally sued Lipin/Ranch at the end of 2008. (Exhibit 2).

27. In July 2009, Farms with their attorney suggested settlement with Lipin/Ranch to end their breach of contract litigation in Maricopa County Superior Court. Farms said they would settle with Lipin if he agreed to pay them back substantially what was owed. Farms said they had loaned $2-3 million to Lipin because he had guaranteed to make them whole, and Lipin had only paid back approximately $400,000. Farms made a $1.8 million settlement offer and informed Lipin this was the best deal they could make to settle the case. As part of the settlement Farms agreed they would give Lipin a $100K credit to pursue a RICO case which they both thought would lead to a significant recovery. Farms also agreed to waive collection of Lipin's personal property and not charge interest for 30 months. (Exhibits 2 and 9).

28. The $11.1 million dollars referenced in the Supplement to the Judgment

Satisfaction Agreement was based on Lipin and Farms understanding related to the RICO lawsuit. Farms believed that the $1.8 million dollars only represented their losses from Lipin's failure to repay their loans. This was not enough to make them whole because as part of the Farms - Lipin agreement was that should the various Lipin businesses/projects become profitable Farms could buy into them and share in the profits. Because Farms and Lipin believed that RICO crimes had been committed which destroyed the businesses before they became profitable Farms lost a valuable asset. Farms and Lipin agreed that the value of the lost business profits destroyed by the RICO crimes was $22.2 million and that Farms share would be $11.1. However it was understood that Farms would only realize the $11.1 million dollars if the RICO lawsuit produced a recovery. The RICO crimes were committed against Ranch, DPC, Mimi and Lipin so Lipin controlled the lawsuit which is why Lipin gave Farms the $11.1 million dollar claim in addition to the $1.8 I owed on the Farms loans. The RICO case was filed and then dismissed by the Court so Farms got nothing. (Exhibit 2).

29. Although Lipin explained the concepts of the Farms $11.1 million dollar agreement to his bankruptcy attorney he scheduled Farms' claim at over $12 million dollars, secured. Lipin's special counsel found the error and the schedules were amended to correct the Farms claim at a little over $1.6 million dollars, unsecured. (Exhibit 2).

30. The settlement was still considerably less than what Lipin really owed AWD Farms. (Exhibit 2).

31. Kathy J. Claypatch is the managing member of AWD Farms, LLC ("AWD

Farms"). As such she has personal knowledge of the facts alleged in the Complaint to Disallow, or in the alternative, Subordinate AWD Farms' Claim. (Exhibit 11, Kathy Claypatch Affidavit).

32. On September 20, 2002, AWD Farms agreed to loan money and assets for agricultural projects to Niles Lipin and Mimi Pierron and signed an "Agreement and Note for Repayment." AWD Farms believed the projects had many humanitarian benefits with substantial revenue potential that would enable the projects to be self-sufficient. (Exhibit 11).

33. The 2002 Agreement and Note for Repayment articulated the parties' agreement and terms for this loan, signed by Niles Lipin, member of AWD Ranch, LLC, Marie (Mimi) Pierron, member of Desert Plants Conservancy, LLC and AWD Farms, LLC members, Celeste Cockrell, Kathy J. Claypatch, Virginia Greenhalgh, and Loraine Kesselring. At all times since the agreement was made, AWD Farms held Niles Lipin and Mimi Pierron personally responsible for the repayment on the Note. (Exhibit 11).

34. In or about the summer of 2007, as part of one of the projects, the ponds were being dug out to harvest the silt and sell it to Pinal County for buildup and improvements to the roads. Pinal County Public Works supervisors / engineers did a site visit to investigate the amount and quality of the silt to be used for their purposes. At the present time, Pinal County is in the process of improving Pecan Road, the main access road to the 1100 acres. Pima County also expressed interest in the silt for a landfill near that region that was being planned to be filled-in and buried in the near future. The silt was

estimated to be worth $1 million dollars or more from bids and AWD Farms was initially to get most of that sale as partial repayment of the monies loaned in the Note. In 2008 AWD Farms still believed the silt would be sold with loan repayment generated by other efforts to sell the cactus and plants from the nursery. This was all in accord with the agreed upon projects, including planting the tree nursery where the land had been leveled and prepared. Potential for loan repayment was expected to be expedited because the proprietary growth enhancement process was proven to work on cactus, but still needed to be proven on plants and trees. Revenue from the silt project and the cactus, plants and tree projects were never realized due to legal and other issues. (Exhibit 11).

35. In or around December, 2008, AWD Farms was forced to file suit against AWD Ranch / Niles Lipin and Desert Plants Conservancy / Mimi Pierron because (1) Farms was brought into the lawsuit as a third party defendant in the Parsons/Walkers case in Pinal County and (2) the loans made by AWD Farms were not being paid back as agreed in the September 20, 2002 Agreement. The lawsuit was originally written and filed by AWD Farms without a lawyer. (Exhibit 11).

36. After AWD Farms was sued by Parsons and the Walkers filed allegations about AWD Farms in an amended complaint in CV2004-01368, intending to sue AWD Farms, the court ordered the LLC to hire an attorney. AWD Farms retained Dustin Dudley, who subsequently appeared for AWD Farms in both cases. (Exhibit 11).

37. Throughout the years, the AWD Farms' members used the words "investment," "loan," "note payable," and /or "note for repayment" interchangeably. The AWD Farms

members are not lawyers and these terms did not have a different meaning to the members. The fact was and remains clear to the managing and other members of AWD Farms that the agreement they entered required personal guarantees for repayment of the loans as set forth in our original "Agreement and Note for Repayment." AWD Farms members would never have imagined using the word "investment" in a complaint would be used as semantic snare against them to assert the AWD Farms members never expected to be repaid for all the money they loaned to Mr. Lipin and Ms. Pierron. (Exhibit 11).

38. AWD Farms would never have entered into an agreement where there were no personal guarantees for repayment of the loan by Mr. Lipin and Ms. Pierron. In fact, included in their ideas for the projects was the potential to eventually negotiate a purchase, after they became profitable, of one or more of the businesses that were first financed by AWD Farms. AWD Farms loaned money and assets to these business projects expecting first to be repaid, and then, making a profit while furthering their humanitarian beliefs. (Exhibit 11).

39. In or around early 2009, AWD Farms attorney advised them that the complaint against Lipin, et al. would need to be amended. However, before that was done AWD Ranch and Desert Plants Conservancy filed for Chapter 11. (Exhibit 11).

40. In or about April, 2009, during a status hearing in the Parsons/Walkers case, AWD Farm's attorney, Dustin Dudley questioned the Walkers' attorney, Kevin Keating, about whether the Walkers were going to pursue their allegations made against AWD Farms.

Keating responded that Walkers were not. (Exhibit 11).

41. Shortly after this, in or about June, 2009, the LLC's bankruptcies were dismissed and Dudley almost immediately filed a motion for summary judgment to get AWD Farms out of the Pinal County case. A couple of weeks later, Parson's attorney, Paul Loucks, called Dudley for a stipulation to dismiss AWD Farms with prejudice. (Exhibit 11).

42. Parsons' dismissal with prejudice and Walkers' removal of their allegations against AWD Farms by choosing to not move forward in the Parsons/Walkers case gave the members of AWD Farms complete confidence they could not be sued again. (Exhibit 11).

43. Once Parsons signed the dismissal, and AWD Farms knew the Walkers were not going to bring them into the Parsons/Walkers case as defendants, AWD Farms members pursued settlement of their lawsuit against Lipin, et al. provided AWD Farms could do the very best to recover their losses through settlement. Besides all of its prior losses, AWD Farms had lost $90,000 - $100,000 in legal expenses and costs. Unfortunately, by this time, in or around the summer of 2009 the silt project had been badly damaged by two years of the wind, rain and weather erosion and in the middle of the heat, the cactus and plants could not be transplanted without risk of shock and complete loss of the crop. Essentially, every business opportunity for Lipin and Pierron to make money from the projects to repay the loans had been blocked, interfered with or destroyed. (Exhibit 11).

44. In or around July, 2009, AWD Farms, assisted by its attorney, held settlement negotiations with Niles Lipin/AWD Ranch and Mimi Pierron/Desert Plants Conservancy.

Niles Lipin said he was considering filing a RICO case. After considering the evidence, AWD Farms agreed Mr. Lipin had a very strong case for a potential RICO lawsuit and other claims for damages. AWD Farms then negotiated what they thought was a fair settlement with Lipin and Pierron. By this time AWD Farms members were all very distraught about all the crimes that had occurred on top of the quiet title litigation that was wasting their time and ruined business opportunities. In their settlement, the goal for AWD Farms was to recover their losses while also allowing Niles Lipin to pursue recovery of damages in the Parsons / Walkers case, RICO or elsewhere. (Exhibit 11).

45. In or around August 4, 2009, the Judgment Satisfaction and its supplement documents were drafted to record in writing the settlement terms. In the settlement, AWD Farms allowed Niles Lipin / AWD Ranch and Mimi Pierron / Desert Plants Conservancy a $100,000 credit for legal costs against the $1.8 million dollar settlement for the loan repayment; plus a 30 month waiver of collection rights and interest on the Note while they pursued all the litigation. (Exhibit 11).

46. Niles Lipin, Mimi Pierron, Ranch or DPC owes AWD Farms $1.8 million dollars for the money Farms loaned them based on the 2002 Agreement and Note for Repayment. However the $1.8 million dollars was not all that was owed. As part of their agreement Farms fully expected to be able to buy into the potentially very profitable businesses Niles Lipin was developing. AWD Farms and Niles Lipin believed the ability to buy into these businesses was a very valuable asset not reflected in the $1.8 million dollar settlement. In addition to the 2002 loan agreement, AWD Farms lost business expectations, namely the

members' expectation of future businesses that AWD Farms envisioned being a part of and working on for the rest of their lives. For example, one member of AWD Farms is now 70 years old and still working two full-time nursing jobs. Had AWD Farms been repaid their loan and the businesses succeeded, this member may have bought into one or more of the businesses on the property that she was passionate about, retired from nursing, and leading educational groups such as girl scouts and boy scouts on bird watching tours in the riparian area of the 1,100 acres. This is just one example of the many business expectation losses the members of AWD Farms have suffered. (Exhibit 11).

47. AWD Farms saw RICO actions that destroyed Niles Lipin's business efforts and future endeavors. Farms and Lipin calculated the projected damages that could possibly be recovered if Niles Lipin was successful in any future RICO litigation, outside the loan repayment. The $11.1 million dollar figure was an estimate of Farms portion of recovery of business damages possible in a future lawsuit for RICO. If Niles Lipin had won the RICO case, he would have paid back AWD Farms' loans and the money could have provided capital to buy into current or future businesses developed by Niles Lipin. The RICO case was dismissed and Farms did not get a penny. (Exhibit 11).

48. While AWD Farms participated in Pinal County litigation as a defendant and then watched the outcome of the litigation, the members of AWD Farms strongly suspected corruption of the court. This is why they believed Niles Lipin / AWD Ranch and Mimi Pierron / Desert Plants Conservancy would not prevail in any of their claims. Even so,

AWD Farms members all still remained hopeful that justice might be served on appeal and they would prevail. (Exhibit 11).

49. At the time AWD Farm was negotiating a settlement with Lipin and Pierron in 2009, the worst crimes against AWD Farms, Niles Lipin, Mimi Pierron, Loraine Kesselring, Lisa Charron, Kessel Farm, AWD Ranch, and Desert Plants Conservancy were still to come. Soon after the settlement, violence increased in or around August 2009 with false imprisonment, a water diversion bridge wash-out, escalating to and after April 2010 with additional destruction, ongoing theft of property, multiple shootings and arsons. (Exhibit 11).

50. AWD Farms never anticipated prior to signing the July 2009 settlement agreement referenced above that Niles Lipin and Mimi Pierron would be in bankruptcy personally over two years later; and never contemplated that AWD Farms could be a major creditor with an adversary proceeding against us in a federal bankruptcy. (Exhibit 11).

51. Farms stopped garnishing Pierron's wages immediately upon notice and advice from their attorney, Becky Cholewka. The post-petition garnished funds were mailed to attorney Chris Barski who forwarded the funds to Pierron. (Exhibit 12).

DATED this 8th day of October, 2012.

/s/*David W. Reichel*,#018121
David W. Reichel
*Attorney for Creditor, AWD Farms LLC*

CERTIFICATE OF SERVICE

ORIGINAL of the foregoing electronically filed this 8th day of October, 2012, with:

Clerk of the United States Bankruptcy Court
District of Arizona
230 North First Avenue, Suite 101
Phoenix, AZ 85003-1706
https://ecf.azb.uscourts.gov

A copy of the foregoing mailed this same date to:

United States Trustee
230 N. First Ave., Suite 204
Phoenix, AZ 85003-1706

By: */s/David W. Reichel*