# Exhibit 2

# AFFIDAVIT OF NILES LIPIN

STATE OF ARIZONA )
)ss
County of Maricopa )

I, Niles Lipin, under oath and penalties of perjury state and allege as follows:

1) My intention was that the Agreement and Note for Repayment would obligate both me personally and my company financially and I was also obligated to work so many hours/week in terms of my labors and efforts for several years to pay back the loans made to me by Farms. My understanding was that Farms was going to lend money for equipment, supplies, labor, taxes and for all necessary items for each project and that any of the supplies that became permanently affixed to the properties would become part of the land and therefore the property of the AWD Ranch LLC. Anything else was Farms' property, such as equipment, or money expended for any other purpose that didn't become permanently affixed to the land was Farms' property. The only value the LLC was receiving was the value of the improvement in the property.

2) Farms was to be paid back was through income producing businesses/projects. Some of them had humanitarian value as well, but they all had a business side to them. Although the idea was they would generate positive cash flow, from which half of the money from each project would go to repay the loan to Farms, there was never any positive cash flow so the losses became the joint and several liability of myself and Ranch. The first five years of lending Farms agreed not to charge any interest. After that Farms charged interest at the prevailing prime rate.

3) I personally guaranteed the money and described it as such in the Agreement and Note for Repayment. The personal guarantee was part of the note. The fact that I didn't sign it personally was just an oversight, but it was obviously the intention of the parties. The parties wrote the note so we knew that was the intention.

4) My understanding was that if either Mimi or I got any large amounts of money from refinancing the property or came into an inheritance, etc., that money would go to

1

Farms to pay them back if the income producing projects were not producing a sufficient income to support themselves and pay Farms back.

5) The 2002 Agreement and Note for Repayment was just a starting point. Farms and I were supposed to go to an attorney and work out a more succinct agreement to cover in greater detail how they could be more secure in their position as a lender. We had discussions about leases and other means of better securing the Note for Repayment, however, I didn't even know if we owned the land because of the title disputes which ended further work on the agreement.

6) Another thing I agreed to was I was not going to jeopardize the Farms members by doing things in any ways that would entangle them in a legal sense. I said I would do things like use a valid title company and generally adhere to sound procedures to the best of my understanding in developing the land and the proper ways of dealing with the legal issues about the land. I would try to keep the use of the property proper and not cause Farms to be sued for anything. Another part of the agreement was that in the future, if a business became successful, one or more of the members of Farms, and/or others, who sought to enter into that business as an owner could do so. That would be a separate new agreement negotiated between the member who was interested in that particular business/project and myself and/or Mimi.

7) The idea was the whole 1,100 acres concept was operated as a potential joint venture between myself and Mimi. We started out with each business/project being a joint venture between only the two of us.

8) Farms was not out on the property most of the time. They had the right to observe, or to have someone out there to make sure their interests in getting repaid and in taking care of their equipment were being carried out. I worked out on the property to do the development work on the land, and Mimi was working in the office in Tempe.

9) The last part of the agreement was that Farms was kept informed about any of the humanitarian aspects of each project, and if any emergency expenditures were made in Farms' name because they couldn't be there physically they were immediately informed thereafter. So Mimi or I might have to pay for a delivery or

supplies either through cash, or on the rare occasion, we had the ability to sign a check. Farms, most of the time, was supposed to pay beforehand or on some occasions immediately thereafter. Farms kept track of the money and we would inform them if we had to make payments such as if something had to be a COD payment upon delivery. Mimi was not the only person ordering things, but she did more ordering than I did.

10) Farms was ultimately responsible for the lending of more money for any of the projects even if I initially thought I was going to pay for them out of income. If per chance there was insufficient income, Farms was ultimately going to make up the difference for the cost of the project. This took place fairly quickly because of the financial problems of not having clear title to the property.

11) We also had discussed that within 3 years if more money would be needed Farms would be paid off via refinancing, but that option went away because of the title issues.

12) Further, I was using my credit that effectively was Farms' credit to buy the tractor and implements. That was supposed to be a joint ownership situation. They would make payments in the beginning and then I would pay them back from the income from the projects. But that never happened because there was never any income. So Farms paid for the entire tractor and many other equipment purchases which was initially bought in Farms and my name. Since Farms fully paid for the tractor, etc., it was agreed and understood that they had full ownership of the equipment.

13) In 2007 we tried to make the pond restoration project have a dual purpose - to restore the ponds for a wildlife riparian area while applying for various state and federal grants, and to harvest the silt and sell it for profit. Because Mimi and I were so delinquent in paying Farms back, the intention was that had the silt deal gone through, we thought that all of the money from that sale should be used to repay Farms. But we didn't know if or how we were going to be able to make that happen with a stop work order on the land and multiple other legal and interference issues happening almost continuously.

14) On their attorney's advice, Farms never entered into any new written contract with me or my LLC because Farms did not want to enter into any other agreement that could potentially pull them into the legal dispute. In the fall of 2007 they contacted me after they met with an attorney who advised them to do another contract. Then about a month later, they talked with different attorney who advised against that. Everything was a verbal agreement after 2003 until they finally sued me at the end of 2008.

15) In July 2009, Farms with their attorney suggested settlement with me to end their litigation against me in Maricopa court. Farms told me they were not in the Pinal case anymore and that was why they had sued me. Farms said they would dismiss their suit against me if I agreed to pay them back substantially what was owed. But they told me they believed, as I did, that I was in a corrupt courtroom and that I may not win the case and would have to appeal and maybe have to sue other people (including for RICO) to try and recover all the damages.

16) Farms said they supported that idea, but insisted they needed to come out substantially whole. Farms said they had loaned me $2 - 3 million, that I only paid back about $400,000 so far, and I had made a personal guarantee to make them whole. They told me this was the best deal they could make to drop the case and offered to settle for $1.8 million owing on their loans. Then Farms said they would give me $100K credit since I was going to go pursue the other legal avenues as best as I could. Farms also said they would postpone collecting on their judgment against my personal property and not charge interest for 30 months so that during that time I could try to recover whatever monies were owed to them.

17) As part of the understanding relating to the 2002 Agreement and Note for Repayment, it was understood that half of the business profits would pay Farms back for the amount owed on the note. Because the businesses were destroyed through RICO activities, Farms did not realize that repayment. From 2002 on, the understanding between Farms and myself was once they were paid back and the businesses were profitable, Farms members had the option to create a new agreement to become an owner or partner of one or more of the businesses.

4
Case 2:11-ap-02300-GBN    Doc 54-2    Filed 10/08/12    Entered 10/08/12 15:09:03    Desc
              Exhibit    Page 5 of 6

18) The $11.1 referenced in the supplement to the judgment satisfaction agreement was based on our understanding related to the RICO lawsuit. Farms believed that the $1.8 only represented their losses from my failure to repay their loans. This was not enough to make them whole because as part of our agreement should my various businesses become profitable they could buy into them and share in the profits. Because Farms believed as I do that RICO crimes had been committed which destroyed the businesses before they became profitable they lost a valuable asset. Farms and I agreed that value of the lost business profits destroyed by the RICO crimes was $22.2 million and that Farms share would be $11.1. However it was understood that Farms would only realize the $11.1 if the RICO lawsuit produced a recovery. The RICO crimes were committed against Ranch, DPC, Mimi and I so we controlled the lawsuit which is why we gave Farms the $11.1 in addition to the $1.8 I owed on the Farms loans. The RICO case was filed and then dismissed by the Court so Farms got nothing.

19) Although I explained the concepts of the Farms $11.1 million dollar agreement to my bankruptcy attorney he scheduled Farms' claim at over $12 million dollars, secured. My special counsel found the error and the schedules were amended to correct the Farms claim at a little over $1.6 million dollars, unsecured.

20) The settlement I made with AWD Farms in 2009 for $1.8 million was still considerably less than what I owed them on their loans to me and Ranch that I personally guaranteed.

Dated this 5 day of October 2012.

_____
Niles Lipin

Subscribed and sworn before
me this 5 day of October 2012.

_____
Notary of Public

Commission Seal: