UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA

_____
                                        )
In re:                                  )
                                        )
NILES S LIPIN          CH: 11  )    2:11-BK-26500-GBN
                                        )
1) ORAL ARGUMENT ON DEBTOR'S CROSS      )
   MOTIONS FOR SUMMARY JUDGMENT (CLAIM  )
   #12)                                 )
                                        )
2) CONTINUED CHAPTER 11 STATUS HEARING  )
                                        )
3) ADM: 2:11-bk-26500-GBN               )
                                        )
   ORAL ARGUMENT ON DEBTOR'S PARTIAL    )
   MOTION FOR SUMMARY JUDGMENT AGAINST  )
   WALKERS (CLAIM #13)                  )
                                        )
4) ADM: 2:11-bk-26500-GBN               )
                                        )
   ORAL ARGUMENT ON DEBTOR'S OBJECTIONS )
   TO CLAIM #12 AND CLAIM #13           )
                                        )
5) THE PARSONS COMPANY, INC. & THE      )    ADV: 2-11-02300
   ESTATE OF ROBERT WALKER AND EVE WALK )
   vs NILES S LIPIN & MARIE PIERRON &   )
   AWD FARMS, LLC                       )
                                        )
   STATUS HEARING ON COMPLAINT RE:      )
   SUBORDINATION OF CLAIM OR INTEREST   )
_____ )

                         U.S. Bankruptcy Court
                         230 N. First Avenue, Suite 101
                         Phoenix, AZ 85003-1706

                         January 18, 2013
                         10:30 a.m.

          BEFORE THE HONORABLE GEORGE B. NIELSEN JR., Judge

APPEARANCES:

For the Debtor:          Richard L. Strohm
                         11 West Jefferson Street
                         Suite 1000
                         Phoenix, AZ  85003

AVTranz
www.avtranz.com · (800) 257-0885

```
APPEARANCES:   (Continued)

For the Walkers:                Kevin R. Keating
                                THE KEATING LAW FIRM, PLC
                                7702 East Doubletree Ranch Road
                                #300
                                Scottsdale, AZ  85258


For The Parsons Co., Inc.:      Paul A. Loucks
                                MESCH CLARK & ROTHSCHILD PC
                                259 North Meyer Avenue
                                Tucson, AZ  85701


For AWD Farms, LLC:             David W. Reichel
                                2700 West Baseline Road
                                Suite 133/166
                                Tempe, AZ  85283
```

Proceedings recorded by electronic sound technician, Kayla
Colasont; transcript produced by AVTranz.

**AV**Tranz
www.avtranz.com · (800) 257-0885

1           THE CLERK:  All rise.

2           THE COURT:  Be seated.

3           THE CLERK:  In the case 11-26500, Niles Lipin.

4           THE COURT:  I'll take appearances in all of the Lipin

5    matters.

6           MR. STROHM:  Your Honor, Richard Strohm on behalf of

7    the Debtor, Mr. Lipin, who is present.

8           MR. KEATING:  Kevin Keating for the Walker creditors.

9           MR. LOUCKS:  Good morning, Your Honor.  Paul Loucks

10   on behalf of the Parsons Company, creditor.

11          THE COURT:  All right.  Counsel, why don't we take up

12   the summary judgment matters first.  That would be calendar

13   items 11 and 13, and I think actually we would probably also

14   discuss calendar item 14, the Debtors' objections to these same

15   claims as well.

16          The -- I'll note in calendar item 11, actually this

17   would be oral argument on cross motions for summary judgment,

18   because the creditor Parsons there filed a cross motion.

19          I'll listen with interest to counsel's presentations

20   but as I usually do, I'll share with you what my current view

21   of the matters are on a -- as a preliminary basis.

22          Quite frankly, it's just not clear to me that it's

23   appropriate to grant partial motions for summary judgment to

24   the Debtor-in-Possession based on the pleadings that have been

25   submitted so far.  It's not clear to me at all.  The -- I

1   recognize there's a suspicion here that there are other sources

2   of recovery that may have occurred or might occur in the

3   future, but I don't think that suspicion currently is a

4   sufficient basis for a ruling of partial summary judgment.  As

5   things now stand, I'm inclined to deny the Debtors' motions.

6   In thinking about granting the Parsons cross motion for summary

7   judgment because based on the current record here, I do not see

8   an appropriate reason to sustain an objection to, actually to

9   either of the creditors' claims here, so I don't currently see

10  things the way the Debtor sees things.  So that strikes me that

11  we'd better hear from the Movant at this time.

12          Counsel?

13          MR. STROHM:  Thank you, Your Honor.  May I approach?

14  I have some slides I'd like to present to the Court.

15          THE COURT:  All right.  Well, okay.  Do you have

16  copies you provided to your colleagues?

17          MR. STROHM:  Yes, sir, actually.

18          THE COURT:  All right.  Okay.

19          We've got slides here, and the slides are going to

20  show me the basis for sustaining an objection to the respective

21  creditors' claims.  Is that correct?

22          MR. STROHM:  Yes, Your Honor.  We had prepared today

23  an oral presentation based on what the Court's calendar

24  indicated from your judicial assistant, and you can see on the

25  first slide what we were talking about was oral argument today

1   on the partial summary judgment motion with respect to claims

2   12 and 13, but also a status conference that was set according

3   to your JA as to 26500.  Mr. Barskey, by the way, is standing

4   by for that.

5            And then we also had from your JA on the agenda oral

6   argument on objections to claims 12 and 13.  However, the Court

7   has already ruled on those as of December 18th.

8            THE COURT:  Indeed.

9            MR. STROHM:  And then also the status conference for

10  the AP-11-2300.  Mr. Reichel is here for that.

11           We did not have any indication from the Court of

12  scheduling the argument on the cross motion for summary

13  judgment today that Mr. Loucks had filed on behalf of Parsons.

14  So that was not on the agenda, and --

15           THE COURT:  The cross motion, however, was fully

16  briefed, was it not?

17           MR. STROHM:  Yes, sir.

18           THE COURT:  All right.  Well, if that being the case,

19  I frankly assumed that we were going to go forward today on

20  that cross motion.

21           But let's hear the argument first of all in support

22  of Mr. Lipin's summary judgment motions.

23           MR. STROHM:  Before I being, Your Honor, I would like

24  to first want to know if the Court would be interested in doing

25  the brief status hearing on 26500?  I believe Mr. Barskey is on

1  the phone, standing by.

2          THE COURT:  All right.  If we can resolve some other

3  matters first, actually -- actually I think -- well, why don't

4  we do this.  Let's call -- let's conduct the status hearing in

5  adversary proceeding 11-2300; that's an action by Parsons and

6  Walker together, to creditor seeking disallowance of fraudulent

7  conveyance actions against the entity AWD Farms, and we'll take

8  any additional appearances.

9          MR. REICHEL:  David Reichel on behalf of AWD Farms.

10          THE COURT:  All right.  Gentlemen, on that adversary

11  proceeding, what's the -- what's the status of the litigation?

12  How should it be managed?

13          MR. KEATING:  At this point we have a stipulation

14  almost finalized as to Parsons' dismissal from the case.  So we

15  -- that should be done within the next day or so, and that is

16  pretty much where we're standing with it at this point.

17          THE COURT:  Yes?

18          MR. REICHEL:  Your Honor, if I may, as the one of the

19  two Plaintiffs in that matter, the -- of course, the Walkers

20  are not going to be stipulating out of that case at all, and

21  there is -- the status of the case from the Walkers' standpoint

22  is that the -- there was outstanding discovery that's been out

23  there for a long time.  Before that discovery was complied

24  with, AWD Farms filed a motion for summary judgment.  We then

25  sort of re-upped our demands for the completion of that

1   discovery, and put off any briefing on the motion for summary

2   judgment.

3        There'd been -- there had been some discussion about

4   depositions being set, but then some people were not available

5   for a while, and so it's sort -- we're in the middle of that

6   discussion about going on, going forward with discovery. And

7   so that's where we're at, you know, waiting for answers to

8   discovery and waiting to set up some depositions, you know, as

9   pertain to Walkers and AWD Farms and the other defendants in

10   that matter.

11        THE COURT: All right. Now, there's some

12   arrangements apparently where they'll be a stipulation that

13   Plaintiffs Parsons Company will no longer serve as a Plaintiff

14   here, Mr. Loucks?

15        MR. LOUCKS: Correct, Judge, and forgive me for

16   speaking from the table instead of from the podium, but I have

17   been in contact with AWD Farms, with both Debtors, and of

18   course with Mr. Keating, and over about the last ten days or

19   so, and I believe we have a stipulation finaled (sic). I

20   circulated just before this hearing a request that I be able to

21   sign for everyone and get that on file hopefully later this

22   afternoon.

23        THE COURT: Okay. And Mr. Keating, will there be any

24   objections from your client to this realignment?

25        MR. KEATING: No, Your Honor.

1          THE COURT:  All right.  Well, that indicates to me,

2    gentlemen, that the withdrawal of the one Plaintiff can be

3    handled by stipulation.  As soon as that stipulated order

4    reaches me, I'll gladly sign it.

5          We do have pending discovery Mr. Keating points out

6    on behalf of Walkers.  So sounds like the parties need to

7    proceed with their discovery here, and I'd be inclined to leave

8    parties alone for say 60 days and just simply bring you back

9    for a status hearing.  Will that work in this case --

10         MR. REICHEL:  Yes, Your Honor.

11         THE COURT:  -- or do we need to make other

12    arrangements?

13         MR. REICHEL:  That'd be fine, Your Honor.

14         MR. KEATING:  Sixty days sounds good to me, Your

15    Honor.

16         THE COURT:  All right.  Let's do this.  I suspect --

17    well, no, I'm not going to suspect anything.  So could we just

18    set calendar item 15, that adversary proceeding, could we set

19    that on one of our adversary calendar status hearing calls in

20    roughly 60 days, please?

21         THE CLERK:  April 2nd at 9:30.

22         THE COURT:  April 2nd at 9:30, I'll take a report.

23    Yes?

24         MR. REICHEL:  And perhaps the Court could note that,

25    you know, the outstanding motion for summary judgment with the

1   briefing on that would be pending the completion of discovery.

2   THE COURT:  All right.  There's a pending motion for

3   summary judgment, and that's going to be continued pending the

4   completion of discovery.  Is -- Mr. Keating, is that right?

5   MR. KEATING:  Your Honor, I'm not sure that I would

6   agree with that position.  I think that the motion can be

7   addressed prior to what has turned out to be quite a lengthy

8   discovery process.  And I would ask the Court that if we're

9   going to have a status conference on the 2nd, that we would get

10  a -- that date for at the very least to have had completed the

11  answering to the summary judgment motion.

12  THE COURT:  Well, what -- the response to the summary

13  judgment, Mr. Keating, that requires the completion of

14  discovery.  I take it I need to be reminded here there was a

15  Rule 56(f) request, is that's what's happening?

16  MR. KEATING:  Yes.  Yes, Your Honor.  I mean, there

17  are -- it's going to be a heavily fact driven motion.

18  THE COURT:  Okay.

19  MR. KEATING:  And although I suppose it doesn't have

20  to wait until the total completion of discovery, we haven't

21  even -- he hadn't even started complying with any of our

22  discovery requests.

23  THE COURT:  All right.

24  MR. KEATING:  It's not like we've been in the process

25  of discovery for a long time, we've been in the process for a

1   long time of propounding discovery, but there hadn't been any

2   responses as yet.  And no dates have been provided for the

3   depositions either.

4            THE COURT:  Okay.

5            MR. KEATING:  So --

6            THE COURT:  All right.  Well, it sounds like the

7   speaking request to complete the briefing, I can't -- I can't

8   deal with that right now.  There's going to be an objection

9   that there's Rule 56(f) implications here.  So we'll leave that

10  alone.  I'll hear -- it'd be good to hear on April 2nd, it'd be

11  good to hear that counsel have resolved this matter, and when

12  and if they do, if they want to stipulate to a briefing

13  schedule on that pending motion in adversary 11-2300, I'll --

14  I'm sure I'll approve the stipulation.  But other than that,

15  I'm leaving the parties alone.

16           Anything further in addressing this adversary?

17           MR. REICHEL:  If I could just bring to the Court's

18  attention, there has been significant discussions between

19  myself and Mr. Loucks regarding settling the case.

20           THE COURT:  Excellent.

21           MR. REICHEL:  And that hasn't went anywhere at this

22  point.

23           THE COURT:  Okay.  Now, that's not so excellent.

24  Okay.  Well, but it -- I do appreciate counsel's attempts, and

25  it's never too late.  Sometimes right in the midst of

1  litigation, the -- either the clients see the light, or they

2  get too many attorneys' bills and then -- were able to settle

3  matters.  So we'll keep that hope alive, and I know counsel

4  will be alert to that.

5          All right.

6          MR. REICHEL:  Thank you.

7          THE COURT:  Good day.

8          I believe now we can direct our attention to the

9  pending summary judgment matters filed in the administrative

10 cases.  Counsel?

11         MR. STROHM:  Your Honor, I thought that Mr. Barskey

12 was available on that --

13         MR. BARSKEY:  Your Honor, I just -- this is Chris

14 Barskey.  I just clipped in by the phone about six minutes in,

15 so I apologize.  But I just want to notice my appearance.  If

16 the Court has any questions on the procedure the admin case,

17 I'd be happy to answer them, but if not, I was going to pass

18 the discussion to counsel who's briefed the issue.

19         THE COURT:  All right.  Why don't we -- let me look

20 quick at my notes on the Chapter 11 matter.  And as I think I

21 recall, now we're largely -- the -- Mr. Lipin is largely

22 delaying the filing of his plan and disclosure statement

23 because of these summary, important summary judgment pleadings

24 regarding these important creditors here.  I don't, unless

25 there's administrative matters to be brought up, frankly, what

1   I would -- what I would suggest we do is simply continue the

2   Chapter 11 status hearing to -- for the convenience of counsel,

3   we could continue that to April 2nd at 9:30.

4           Will that work for everyone?

5           MR. BARSKEY:  That works for me, Your Honor.

6           THE COURT:  Okay.  That's what we'll do.  We've got

7   to resolve this -- these contested matters first, and I'll take

8   another Chapter 11 report on April 2nd at 9:30.

9           MR. BARSKEY:  Thank you.

10          THE COURT:  Okay.

11          Now, let's see if we're ready for summary judgment.

12          MR. STROHM:  Thank you, Your Honor.  But before I

13  begin, when we were before the Court last November, the Court

14  asked a question of me that I had a tentative answer for, and

15  now I've gone back and reviewed the documents and records and

16  have a firm answer for.  The Court had asked me whether the

17  Walkers' fraud claim against Mr. Lipin was ever brought up

18  before any court, including the Pinal County Superior Court in

19  the post-trial motions in Pinal County, or in Division 2 of the

20  appellate court with respect to the 60(c) motion, or in the

21  Rico action.  And I've gone back and reviewed all of the

22  pleadings, all of the minute orders, and I have found that

23  there has been no determination on the merits of that statute

24  of limitations subject matter jurisdiction issue.  I apologize

25  for the Court for not having that at my fingertips last time we

 1   met, but it is a very lengthy record involving lots of cases.

 2            THE COURT:  Is that a claim, this fraud claim, is

 3   that a claim that could have been brought in Pinal County but

 4   was not for whatever reason?

 5            MR. STROHM:  It could have been brought, but it's

 6   jurisdictional, Your Honor, and never waived.

 7            THE COURT:  Okay.  Understand.

 8            MR. STROHM:  All right.  I know the Court has reached

 9   tentative conclusions, and I have an uphill battle, and what

10   I'd like to do is to begin by making some remarks that I think

11   are common to both the Parsons claim and to the Walkers claim.

12            Our position is that with respect to offsets, in

13   order for the Court to do its job and for the estate to have

14   full value, we need to understand exactly what has been paid to

15   them as setoffs, and that is a mystery.  Our position is, and

16   under the case law I think it's supported, that anything that's

17   received, and we're talking about cash or anything that can be

18   monetized that was allegedly suffered as a result of any of the

19   damages claimed by these creditors because of the easement

20   dispute, that amounts to a setoff, a setoff against any sums

21   that either Walkers or Parsons are now seeking against Lipin

22   and Ranch.  And I think with respect to Parsons first, the

23   record is absolutely clear, and this is the basis for our

24   summary judgment because there is no disputed fact over this

25   issue.  Rule 56 seems to suggest that we're entitled to this.

1    Parsons only had one easement.  And he can recover his damages,

2    his damages on this easement only once, and that includes

3    attorney's fees.  We have one easement, one set of litigation

4    that spawned a number of satellite theories back and forth

5    against the others, but all of it came about by virtue of this

6    1998 cattle agreement which in essence was a license given by

7    Walkers to Parsons to run an entire cattle operation.  And I

8    think what we lose sight of in this case when we're talking

9    about easement is we're thinking of this as simply a case where

10   there is an easement that was filed with the recorder -- it

11   wasn't filed with the recorder's office that later served as to

12   net became a problem with the litigation.  It's a little deeper

13   than that.

14              The actual agreement between Walkers and Parsons is a

15   19-page agreement, two provisions of which are significant.

16   First one is that in 1998 Walkers and Parsons agreed that

17   cattle could be run all over the entire 1,100 acres.  There was

18   no easement dedicated just to cattle grazing.  So, Judge, this

19   is not a situation where you have a couple of cows going down a

20   path, nose to tail, to the water.  This is a situation where

21   the entire 1,100 acres was subject to the Parsons cattle ranch.

22   That was by agreement between Walkers and Parsons.  The reason

23   why that's significant is that it wasn't just merely a

24   discussion about easement, it was a discussion about whether

25   there could be a use that would be nonconforming that would

1   interfere with the cattle operation.

2           And so our position is at the outset if you have one

3   litigation, you have one set of facts which involves a single

4   easement or a single cattle operation, then they can only

5   recover one set of damages for all of the things that they've

6   experienced they're claiming against Lipin and Ranch as the

7   problem.

8           So what we've done in our moving papers, Your Honor,

9   is we've tried to outline to you some of the things that we

10  believe are proper setoffs.  Parsons simply cannot collect the

11  same damages twice.  And until the Court allows us some

12  discovery on this, and until the Court allows us a specific --

13  until the Court requires them to provide the specific details

14  of the setoff, we're flying blind.  We don't know exactly what

15  was received and whether they have received full compensation

16  or partial compensation.  And as we'll show here in a minute,

17  we may end up in a position where the entire claims, both

18  Parsons and Walkers, are extinguished because of the recoveries

19  that they've received from Fidelity, or from Mesch Clark, the

20  law firm, or between themselves.

21          THE COURT:  Now, have I refused to allow the Debtor

22  to conduct this discovery?

23          MR. STROHM:  No, sir, and I don't mean to imply that

24  you have.  We have not --

25          THE COURT:  Okay.  Well, I wondered about that

1    phraseology "until the Court allows this" because we're merely

2    -- the parties, as you know, when parties need discovery, they

3    just do it.  Has that been accomplished here?

4            MR. STROHM:  We have not, Your Honor, and we've not

5    done it for two reasons; one is that both Mr. Loucks and Mr.

6    Keating have indicated in papers filed with the Court that they

7    will not disclose these settlements, that they're irrelevant

8    from their point of view.  Mr. Keating claims that they're a

9    violation of Rule 408, which is nonsense, but they won't

10   voluntarily disclose them.  We've asked for discovery from them

11   informally.  We have not followed it up formally.  What we

12   would like to do, of course, with the Court, because the Court

13   is continuing -- if the Court will stick with its original idea

14   of denying our partial summary judgment motion today, then we

15   will follow up because that issue of offsets is still in the

16   case.  It just means that the summary judgment hasn't been

17   granted.

18           THE COURT:  Well, it seems to me with respect,

19   counsel, that if the discovery, if the formal discovery to

20   establish Mr. Lipin's suspicions about what has happened here,

21   and multiple recoveries, if that discovery hasn't even

22   accomplish -- hasn't even been formally instituted yet, how

23   could it -- how could there possibly be a basis for summary

24   judgment?

25           MR. STROHM:  Well, the basis for summary judgment is

1  that we have one easement, that we know that there were damages

2  that flowed from the easement, both against Mr. Lipin and Farms

3  and also with respect to the Walkers and Parsons.  They have a

4  deal back and forth between each other.  We don't know the

5  terms of that deal.

6         THE COURT:  So what we -- so that the -- to the

7  extent there's a setoff, there is -- it is surely not

8  liquidated at this point.

9         MR. STROHM:  At this point, we cannot monetize all of

10  the settlements.  We only have information from attorney's

11  slips and from other pleadings that were filed in some of the

12  satellite litigation.  But what we can do is we can make a

13  representation to the Court that the setoffs are for damages

14  that arise out of the easement, which is the single litigation

15  that we have in this case, which prevents double dipping or

16  triple dipping.  We only have one set of damages that either of

17  these creditors are entitled to, yet we have a number of

18  different moving parts here with respect to compensation for

19  the easement damages that each has allegedly experienced.

20         So our position is with respect to Rule 56 that we at

21  least have the right to have the Court decide to ask -- decide

22  for us that there is no material issue of fact as to whether

23  there are offsets.  The amount of those offsets we're prepared

24  to do discovery on to find out, and if they refuse, we would go

25  back to the Court with a motion to compel.  With respect to

1   Parsons --

2            THE COURT:  The existence of the offset is not a

3   disputed material fact?

4            MR. STROHM:  They admit offsets, but they deny is

5   that the offsets ought to be applied to this Debtor.  Our

6   position is that at -- when we look at each of the individual

7   offsets, all of them arise out of a single easement litigation,

8   and therefore must be considered part of the offset for this

9   Court to consider.  And the Court is -- or equity.  You can

10  fashion any order that you like with respect to this.  And we

11  believe that we have sufficient grounds to have the Court find

12  under Rule 56 that there's no disputed issue as to any material

13  fact regarding the existence of offset.  The only question is

14  how do we monetize them?  And I have some suggestions in a

15  moment.

16           The point I'm trying to raise with the Court is that

17  both Walkers and Parsons have made an attempt to try to collect

18  the same attorney's fees, deficiency damages, other damages

19  that are related to fraud, other damages that are related to

20  this easement litigation, without giving appropriate credit to

21  Lipin.

22           Let's go with the first slide, please.

23           I'd like to look first at the Parsons' number 13

24  claim and also include my remarks with respect to what I'd be

25  arguing on the cross motion.  This is the Parsons judgment, and

1    I'd like to point out with respect to the Parsons judgment that

2    it finds damages in the amount of 190,800.  That's easement

3    damages, and it does not name Mr. Lipin, the Debtor, in this

4    document.

5              Next, please.

6              You can see that the total amount that's awarded is

7    265,475, but the middle paragraph of that exhibit, the very

8    judgment we're talking about that Mr. Loucks wants the Court to

9    take notice of, indicates that the judgment is applied only

10   against AWD Ranch, LLC, Desert Plants Conservancy.

11             THE COURT:  I -- I -- I don't know if this would help

12   or not, and I'll be happy to discuss this further with Mr.

13   Loucks, but my preliminary indication is not to grant the cross

14   motion as to the $190,800 portion of the judgment, because it

15   seems to me that the -- that the predicate for Mr. Lipin's

16   liability for this amount has not been met at this point.  Now,

17   the creditor is confident it can establish that, and what

18   appears to be perhaps some type of an equitable argument and

19   perhaps it can, but currently, I'm disinclined to grant cross

20   summary judgment to the creditor on that component of the

21   claim.

22             MR. STROHM:  All right.  Thank you, Your Honor.

23   Let's move on then.  Next slide, please.  Next slide.

24             This next document is Exhibit A, which Mr. Loucks

25   filed which was an objection to our motion for additional facts

1   and I'm not here to argue the additional facts motion which the

2   Court has set for March 15thth.  However, I am here to point

3   out to the Court -- next page -- that what we're talking about

4   is these parties that we have in this litigation being limited

5   to those that are outlined in red.  Mr. Parsons -- Mr. Loucks

6   on behalf of Mr. Parsons has indicated that somehow there is

7   this idea of despite the fact that Mr. Lipin was never named as

8   a party by Parsons, that he is nonetheless in a litigation

9   because there was an answer filed by AWD Ranch and Desert

10  Plants Conservancy and Niles Lipin to the cross claim and third

11  party complaint.  So what I've got up on the screen for the

12  Court to take a look at is this is simply the only appearance

13  that Niles Lipin had in this case is with respect to this

14  document right here, Parsons against Ranch, Walkers, Desert

15  Plants, Walkers then third party and Lipin, and that's it.

16  Parsons never went back against Lipin, and none of the

17  judgments in this case that Mr. Loucks has that Parsons is

18  claiming and relate to Lipin at all.  So even with respect to

19  the 190, when we shift to the 265, we don't have any

20  identifying -- we don't have any way of identifying Mr. Lipin

21  as the person responsible because he was never sued by Parsons.

22  Just wasn't.

23          Next.

24          Mr. Loucks is arguing that Mr. Barton's (sic)

25  signature on behalf of Mr. Lipin in this answer to the third

1  party complaint is what gives him the right to claim that there

2  is an entitlement Parsons has for a judgment against him.  But

3  still they've admitted in their response that there is no

4  service.  There's no affidavit of service, there's nothing

5  which would indicate a pleading which would indicate that

6  Parsons was in fact suing Lipin.  There certainly was never any

7  litigation with respect to that.  That only comes about by

8  virtue of this single document.

9       So what we're arguing is that if there is no service,

10  it's a violation of due process to allow Mr. Loucks to stand up

11  in Court and say, well, Mr. Barton (sic) answered for Mr. Lipin

12  when that answer is reflective only of a response to a third

13  party complaint filed by the Walkers.  It's inappropriate.  So

14  we believe the entire 265,000 should be offset and not

15  permitted.

16       Next.

17       When this case began, Mr. Loucks filed on behalf of

18  his client what he called a placeholder claim, and the

19  placeholder claim was fairly significant.  He originally filed

20  a $456,275 placeholder claim which he later reduced

21  voluntarily.  We, again, believe this is the result of an

22  offset that he received from Walkers or Fidelity or some other

23  third party, and that reduced his claim further.  And then he

24  also put in this issue of Lipin being responsible for the 190

25  easement damages, and even though he's not named in the

1  judgment.  So if you -- if we take the way what the Court has

2  already indicated it's going to do, which is to reduce by

3  190,800, and then take out the 114, we're left with 151,475,

4  and our position is that all of this is dischargeable.  All of

5  this should not be subject to any kind of reasonable claim that

6  it was a false claim because it does not run against Lipin.

7         Next.

8         We've already indicated to the Court that the parties

9  have admitted settlements, and Mr. Loucks' refusal to disclose

10 the terms of the settlement is stated here in document 181.

11 Our position is that that's not adequate, that that also

12 establishes at the outset an entitlement to us for judgment on

13 the issue of easement damages being subject to the offset.

14        Go ahead, next.  Next.

15        We don't have any reduction in the offsets other than

16 the 114,000, but we do believe there are others which I'll

17 explain in a minute.  There has been no effort to correct the

18 filing of the original claim, which we think is unclean hands.

19 Mr. Loucks has come to Court, he's made a 465,000-some-dollar

20 claim which we now know is incorrect by 114,000.  We know that

21 190,000 of that judgment doesn't apply to this Debtor, and yet

22 now he's still claiming that there is some sort of entitlement

23 that he has by virtue of osmosis because Mr. Lipin happened to

24 be in the case.  That's improper.  In our view, that's unclean

25 hands and is grounds for the Court to simply reject the claim.

1  I'm citing the Effort case, which is in our brief.  If the

2  Court -- the Court has discretion, but if the Court looks at

3  the documents, I think the Court will be convinced that there

4  was no basis for filing any claim on the part of Parsons in

5  this case.  Walkers' a different story.

6         Next, please.

7         The Waffle House case and the Hyatt Regency case

8  clearly indicate that the Court's obligation is to make sure

9  that there is no double recovery, and in our position, for our

10 position, the entire amount of the claim would be exactly that,

11 a double recovery, not only because of the offsets, Judge, but

12 because the original 265,000 doesn't even run against Mr.

13 Lipin.

14        Go ahead.

15        If the Court does not disallow claim number 12,

16 what's going to happen is that Parsons is going to have a

17 windfall.

18        Next.

19        One of the things that I think is lost in both

20 Walkers' and Parsons' objections and their position with

21 respect to our motion for summary judgment is the rule of law

22 that we're dealing with in terms of damages.  We're talking

23 about a contribution issue here.  There's a single recovery

24 rule, and if they've recovered from third parties obviously

25 we're entitled to offsets for it.

1          Next.  Next.

2          These are what we think are the settlements that

3    ought to be considered by the Court, and again I think we're

4    entitled to summary judgment on this because all of these flow

5    from the easement litigation that began with this problem that

6    was created by the 1998 deal, cattle deal between Walkers and

7    Parsons.  In 2008, there was a release and extinguishment of

8    the 1998 cattle deal that allowed Parsons access to all 1,100

9    acres.  Now, the importance about that, spin this up for you,

10   for the Court, the reason why that's important is that up until

11   that time, if that easement still existed and it would exist

12   forever unless one of the parties changed it and the other

13   party agreed, it would exist forever and it would prevent

14   anything, any kind of use on that property except for what

15   might be considered a cattle operation.  Certainly an innocent

16   third party purchaser, like Mr. Lipin and his LLC, couldn't

17   come in and put up buildings and do roads and fence and all of

18   the rest if they're doing it in the middle of a cattle

19   operation.  So the significance of that settlement was that the

20   settlement between Walkers and Parsons in '08 ended seven years

21   of contested litigation between those two parties, and it freed

22   up Walkers opportunity now to go out and sell to a third party

23   without being restricted to having to disclose a cattle

24   ranching operation.  The third party could buy it for whatever

25   purpose.  Secondly, Parsons claimed $47,000 every year to its

1    cattle ranching operation from the Walkers because of the non-

2    disclosure of the 1998 deal to Lipin, and as a result of that,

3    there was a feeling on the part of Lipin that there was an

4    unfair advantage taken of him because he was not given credit

5    for this.  And I think, Your Honor, again, this is an equity

6    issue, and that $47,000 in damages that was taken every year

7    went away.  That was extinguished by virtue of this settlement.

8           Finally, there was satisfaction of a promissory note

9    of approximately 450 -- 1450 a month for 19 months, another

10   $30,000 that flowed to -- that flowed to Parsons.  I shouldn't

11   have said finally, there was one other and very important

12   aspect of that 2008 settlement that we haven't discussed.  The

13   property is valued at approximately $5,000 an acre, up to

14   $15,000 an acre.  We've provided the Court with the comps in

15   the area and also the planning from the County to indicate the

16   value of the property.  There was a hundred-acre parcel that

17   was deeded to Parson (sic) from the Walkers as a result of this

18   settlement.  If we were to simply do the math on that, that's

19   at least $500,000 in value, up to a million-five in value that

20   Parsons received that would absolutely extinguish this claim

21   just by that alone.

22           Next.

23           In addition, there was another settlement between

24   Parsons and Fidelity.  This had to do with a clouded title

25   issue in January of 2010, and also another settlement between

1   Parsons and Rothschild, and we believe that this had to do with

2   attorney's fees.  Mr. Rothschild you recall was the author, the

3   drafter of an ambiguous easement which was not properly

4   recorded, and there was a suit by Parsons against that.  We

5   don't know the terms of that.  We believe it had something to

6   do with forgiveness of attorney's fees, which is the subject of

7   the original judgment.

8           THE COURT:  What would the basis be for declaring an

9   offset assuming this settlement actually occurred, a settlement

10  of attorney's fees, if the attorney's fees dealt with a matter

11  involving the alleged wrongdoing of a third party,

12  Mr. Rothschild?

13          MR. STROHM:  It grew out of the easement litigation

14  that would not have occurred but for Mr. Rothschild's

15  incompetence or his negligence, and if there had not been -- if

16  there had been a correct easement that had been drafted, we

17  never would have been in this position because my client would

18  have discovered it, and he would have known the terms of it and

19  would have been warned off that he was about to buy what was a

20  cattle operation, or land that was subject to a cattle

21  operation that would prevent him from doing the basic thing

22  that he bought the land to do.

23          THE COURT:  That sounds like an argument that Mr.

24  Lipin has a claim against the Rothschild interest as well for,

25  that he has some right to rely on the appropriate creation of

1   the easement.  But to the extent the Parsons have claim against

2   that party, it's difficult to see why a credit should go to the

3   obligations that Mr. Lipin has been declared to owe to these

4   creditors.

5           MR. STROHM:  The idea is whether the creditor has

6   been made whole, and we don't know the extent of what the

7   attorney's fees involved, but when they're coupled with the

8   other settlements, they also imply that there was something

9   that was received of value that we ought to be getting a credit

10  for.  The attorney's fees were not spelled out by Judge Olsen.

11  The attorney's fees were simply granted.  We don't know what

12  portion of those might have been related to Mr. Lipin's problem

13  with the easement, or his contesting of the problem with the

14  easement.

15          Finally there is the Walkers' 2012 lawsuit against

16  FATCO and Gust Rosenfeld.  Those are also possible setoffs.

17          Let's go to the next one, please.

18          Your Honor, I know the Court has -- it's considering

19  denying our motion, but I think it's critical that we look at

20  the Lundell versus Anchor Construction case, because our burden

21  is very minimal in this case.  We don't have to do a lot.  We

22  came about these offsets in a way that is totally outside the

23  scope of this hearing.  The creditors didn't volunteer this

24  information, we found out about it by examining attorney's

25  times slips, and we also found out by talking to other lawyers

1    who were involved in some of the satellite litigation.  We've

2    presented to the Court adequate grounds for believing there are

3    setoffs, and all of these setoffs arise out of the cattle

4    operation/easement issue.  The burden shifts then and the

5    creditor is required to prove the validity of the claim and

6    account for all of the offsets.

7            Next.

8            So to recap the Parsons offsets, we have a hundred

9    acres deeded to Parson (sic), property comps in the area of

10   1,100 acres indicate that this might be worth a million-five.

11   The City of Mesa owns land in Pinal County.  We've indicated

12   this in our moving papers, 11,000 (sic) acres now are selling

13   between 8,900 and $15,000 per acre, and again, we're looking at

14   a value of simply this one tiny transaction of the benefit that

15   Parsons received as a result of the Walkers-Parsons secret deal

16   to be a million-five and way in excess of what the Parsons

17   claim is now.

18           Next.

19           So with respect to Parsons, Your Honor, what we're

20   requesting that the Court do here is to find that claim 12 is

21   entirely offset, because it doesn't run against Lipin.  And to

22   disallow as unclean hands the entire claim because it's been

23   submitted as a false claim since it doesn't run against Lipin,

24   and because the creditor has already been made whole, more than

25   whole, and find that the claim is not 456,275, but 151,475 if

1  the Court is not inclined to dismiss entirely because of the

2  unclean hands, that figure would be subject to offsets. And

3  the offsets would come from the Walker deal and/or the Fidelity

4  and/or the Rothschild deal. But specifically if we look at

5  just the Walker deal which directly relates to this, clearly

6  we're talking about damages of well in excess of 265,000, well

7  in excess of $151,000 if the Court accepts the offset.

8          And finally we request that the claim be extinguished

9  if the offsets the Court finds exceed the 151,475. Judge, that

10 concludes my remarks with respect to the Parsons. I am

11 prepared to begin the Walkers if the Court would like that, or

12 if the Court would prefer to have Mr. Loucks address the Court?

13         THE COURT: Let's have you discuss both of your

14 motions, whatever you want to add to those papers. Again, I'll

15 assure all of the counsel I have read the papers here as well,

16 so it's --

17         MR. STROHM: Thank you, Your Honor. Let's go to the

18 next --

19         THE COURT: Whatever you choose to emphasize or

20 comment about, fine, but you can rely on the fact that I've

21 absorbed the pleadings.

22         MR. STROHM: Thank you, Judge.

23         This is the judgment that Mr. Walker is claiming on

24 the part of his client -- excuse me, Mr. Keating is claiming on

25 the part of his client, the Walkers, and it's basically arising

1    out of a deficiency judgment.  Next.  And I've outlined what

2    those dollar values are.  The deficiency judgment less the

3    credit bid left a balance of approximately $240,000.  Next.

4    Add on to that, the attorney's fees, costs, there were taxes on

5    the property that hadn't been paid in interest, and the total

6    amount of the claim is a million-forty-thousand, and that's

7    accruing interest at about ten percent per annum.

8               Next.

9               However, we have found that Mr. Keating has alleged

10   in his complaint against First American Title or FATCO and Gust

11   Rosenfeld, the law firm that was representing my client, that

12   he has made the very same claim for virtually the same amount

13   of money against FATCO and against Gust Rosenfeld as he has

14   against Mr. Lipin.

15              Next.  Next.

16              In fact what he's alleging -- and this is taken from

17   his response to a motion to dismiss that was filed in this

18   lawsuit -- and I'm quoting directly from it, this is Mr.

19   Keating's words on behalf of Walker in the suit against FATCO

20   and Gust Rosenfeld about the easement litigation.  It says,

21   quote,

22              "In the process of committing violations, FATCO

23              and Gust unreasonably expanded and delayed the

24              proceedings.  Gust was counsel of record,

25              usually the sole such counsel for the insured

1          client and FATCO was paying for the directing of

2          that behavior."

3          The importance of this is to show that Mr. Keating is

4    now of the belief that the reason why there were so many

5    adversarial proceedings and so many difficult things that

6    occurred in that litigation was not due to Mr. Lipin's

7    activities, but it was due to his lawyer's activities being

8    directed by FATCO.

9          Next, please.

10         Mr. Keating then says in his document which we

11   believe is a judicial admission, it was filed with his

12   signature, it says that even at the apparent expense of their

13   own insured client, FATCO and Gust in these actions, and it

14   cannot be emphasized enough, Mr. Keating says, and it is very

15   telling that much of Gust's behavior in the underlying lawsuit

16   was useful only to FATCO and was decidedly unhelpful and

17   damaging to the client AWD-DPC.

18         Next.

19         And so he's saying to the Court in essence that the

20   actions of AWD-DPC were really the actions of FATCO and Gust

21   Rosenfeld.  And he says specifically in this slide 24, he's

22   alleging that the lawyers and the company were artificially

23   delaying and expanding the litigation pursuing claims and

24   defenses without justification, harassing and purposely

25   damaging the Walkers.  This is different than anything Mr.

1  Keating has said in this entire history of the lawsuit over the

2  seven years.  This has been our position from the beginning.

3  And our situation here, Judge, now we find ourselves in

4  Bankruptcy Court is that Mr. Keating is now saying everything

5  that he claims we did wrong really was done by FATCO, really

6  was done by their lawyers, not by Mr. Lipin.  And his judgment

7  that he's claiming against us, he's saying that same amount of

8  money ought to be paid by FATCO and by the lawyers.

9          Next.

10          Mr. Keating also indicates that not only was the

11  litigation controlled by FATCO and the lawyers, but the

12  outrageous actions that were ultimately formally attributed to

13  AWD-DPC by Judge Olsen were really the acts of the Defendants

14  he's now suing.  He says also that the fact remains that the

15  progenitors of the damaging, fraudulent, harassing, faithless,

16  and disloyal actions were FATCO and Gust, not Lipin.

17          And finally, in his conclusion, this is very telling,

18  those litigation practices carried out by FATCO and Gust

19  improperly damaged the Walkers in an amount with interest of

20  over $1.4 million.  Well, here he's admitting that this is what

21  he is entitled to, which is what he has in terms of a judgment

22  against Lipin when the very conduct that gives rise to the

23  Lipin judgment is now recognized to be the fault of FATCO and

24  Gust Rosenfeld.  He's speaking out of both sides of his mouth,

25  he's made a judicial admission, and he comes to Court with

1  unclean hands when he's filing this complaint.

2          THE COURT:  Now, these statements in the pleading by

3  counsel were, of course, focused on the parties then involved,

4  the targets then involved, FATCO and the Gust law firm, and

5  what these statements don't say is that this has -- that Lipin

6  had nothing to do with damaging the Walkers.  Is that not

7  correct?

8          MR. STROHM:  That's correct, Your Honor, but I would

9  respectfully point out that if we follow the one recovery rule,

10 if Mr. Keating is now saying that the recovery of $1.4 million

11 is the legal responsibility of FATCO and the lawyers, he can't

12 also say and it's also the legal responsibility of Lipin.  It's

13 one or the other, and at best, we're entitled to a setoff is

14 there is any recovery out of this case against that, because

15 it's the same theory, except it adds one other point, which is

16 that Lipin didn't do anything wrong, he doesn't say that, but

17 the lawyers who directed litigation, who did things that the

18 Judge hated, and took it out on Lipin were actually the ones

19 who were responsible for it.  And that's just not fair.

20         Next, please.

21         Judicial estoppel bars Walkers' claim number 13 in

22 its entirety, Your Honor.  And I've looked up the leading case

23 on judicial estoppel, which is the Standedge Ventures case,

24 shepherdized (sic) it.  It's still good law, and basically

25 requires three elements: the parties must be the same, and here

1    they are, Walkers and Lipin; same fact question, who owes the

2    damages; and the party asserting the inconsistent position,

3    which is the Walkers, must have been successful in a prior

4    judicial proceeding, and they are, they've got a judgment

5    against Lipin.  So with all of those factors being in place,

6    those judicial admissions are usable against this creditor who

7    comes to Court with unclean hands, and is asking Your Honor to

8    say that Lipin is responsible for all this when he admits Lipin

9    isn't, or he admits other people are.  He's got one chance of

10   recovery, and that one chance of recovery, that one bucket of

11   money, we're entitled to contribution from if it turns out that

12   he receives anything from it.

13          Next.

14          You asked earlier, Your Honor, about whether there

15   had been any requests, and I know the Court is sensitive about

16   discovery requests coming out, and the reason why we did not do

17   discovery requests in this area is because we know they would

18   be futile.  I had another slide earlier that indicated that Mr.

19   Loucks took the position that he wasn't going to disclose.

20   This is the same slide with respect to Walkers.  Walkers were

21   not going to disclose.

22          THE COURT:  Well, your client was not obligated to

23   accept that decision from the opponent, however.  Your client

24   was -- had the right to force the issue by formally propounding

25   discovery requests.  Did he not?

1          MR. STROHM:  Yes.  But the reason why that didn't

2     happen was because two things; one is they felt it was futile.

3     I know they had the legal responsibility to go ahead and force

4     the issue, but secondly, keep this in mind; these offsets, or

5     alleged offsets, or secret settlements, were discovered after

6     the original motion for summary judgment was filed.  These were

7     filed as supplementals.  We didn't have the time to go out and

8     visit a stat room and get all the material back to present to

9     the Court or to litigate whether there's a motion to compel

10    that they should be required to follow.  We just didn't have

11    the time to do that, so that we put it in and when we did the

12    research for the Rule 56, we found the -- what we think is the

13    controlling view, which is that if it arises out of the same

14    litigation, all of the easement litigation, then the offsets

15    can be considered by the Court.  Whether those offsets can be

16    monetized at the time you make the motion no law says.  Our

17    intent was to bring it to the Court's attention, get a summary

18    judgment ruling indicating that offsets are present, and then

19    do the discovery necessary to bring back to the Court to show

20    that either they've been made whole or their judgments had been

21    reduced.

22          Next.

23          In Walkers case, they admit that they received

24    benefits as well.  And remember the easement relinquished

25    extinguishment is huge, and here's why.  Remember that Parsons

1   claimed that his damage was $47,000 per year because of

2   Walkers' failure to disclose to Lipin, the buyer of the

3   property, of the cattle operation, and therefore his cattle

4   operation was affected.  And he's losing 47,000 bucks a year.

5   That happened for a period of almost ten years, or at least

6   eight years.  And so when they made this deal, that is when

7   Walkers and Parsons made this deal in 2008, what they did was

8   they basically extinguished that cattle operation limitation or

9   easement which allows Walker now to go out and sell to third

10  parties.  So Walkers benefit is that he not only got the land

11  back from us in a foreclosure, and he also has a deficiency

12  judgment sitting out there, but he also made a deal with

13  Parsons where Parsons now releases him and he can sell that

14  land not subject to the easement at all.

15          Secondly, there was a forgiveness of the note of

16  $30,000 that was still money that was owed by Parsons to

17  Walkers for grazing rights on the 20 acres that was isolated

18  amidst the 1,100 acres that my client bought, along with other

19  grazing rights on the 1,100.  That was being paid for at a rate

20  of $1,500 per month.  There was 19 payments left to go on it.

21  That was also extinguished to the credit -- I think to us as a

22  credit of $30,000, and most importantly, this hundred acres of

23  land was given, and again that's between 500,000 and $1.5

24  million in value.  That was part of the settlement.  That's

25  what the price was to get rid of this.

1          Go ahead.

2          The -- when we asked for disclosure, Mr. Keating

3    indicated that we don't have to tell you and we're not going to

4    tell you, besides all settlements more or less are created

5    equal, meaning that we got value back for whatever we gave.  So

6    if that's true, and he gave away land that was worth 500,000 to

7    1.5 million, presumably he got something back that was worth

8    that, which would probably be the easement relinquishment

9    extinguishment, would stop the bleeding of the $47,000 per

10   year, and stops the running of this covenant to allow a cattle

11   operation infinitum.  It would go on forever unless there was

12   this deal.  Walkers were handicapped, they could not sell the

13   land unless they made the deal, and we should get a credit for

14   that.

15         Next.

16         Finally, with respect to the only objection that Mr.

17   Keating has alleged in this case to disclosure is this Rule

18   408.  He cites no authority whatsoever in his moving papers,

19   nothing.  The only thing he cites is Rule 408, rule of

20   evidence.  Rule 408 is designed to do one specific thing, to

21   make privileged any conversations or negotiations that relate

22   to prospective settlement.  It doesn't prophylactically bar any

23   discussion of settlement after the settlement has occurred.

24   And what I'm trying to get across to the Court that Mr. Keating

25   missed is that we're not interested in using this information

1    to establish liability.  That's what 408 is designed to do.

2    You can't take someone's willingness to compromise a claim and

3    use that against him to say, well, you're willing to

4    compromise, that must mean that you're liable.  That's not the

5    context in which we're using it.  We're saying that there are

6    settlements out there that are legitimate offsets that are the

7    meat of this Bankruptcy Court's job to figure out and help us

8    figure out until the Debtor's estate is clear.  And because of

9    this rule, he's alleging he doesn't have to disclose, and we

10   believe that that's -- if that's the only defense that he has

11   to it, it must fail.

12              Next.  Next.

13              Now, one last point, Your Honor, and then I'm -- wrap

14   up here.  A couple of things that the Walkers have not failed

15   to give us setoffs for that are very important, and nobody's

16   really talked about them throughout this case, and that is that

17   you have the warehouse that my client put up, approximately

18   10,000 square feet.  It's called a galvalume.  It's a steel

19   hybrid and it's very expensive type of metal that was used to

20   build this warehouse for their needs.  There's also a nursery,

21   there's a number of ponds, there are septic tanks, there are

22   roads, there's over ten miles of barbed- and chain-link fencing

23   that's still there, and they won't give us access to the

24   property, nor will they give us a credit.  Nowhere in Mr.

25   Keating's claim does he give us any credit for any of this

1   land.  All of these assets affixed to the land were just simply

2   ignored.  We're entitled to credits for those.

3           Walkers foreclosed the collateral but have refused

4   access, and they've also refused to give us any credit on the

5   deficiency.  That's improper.

6           Water wells exist.  We also have shown in our moving

7   papers that there are water wells that exist.  We also have

8   discovered for Mr. Walkers' convenient -- convenience after he

9   received the property back in foreclosure, at our expense we

10  drilled, discovered, and we have certified water that's

11  potentially worth $43 million.  And it's the only water in the

12  east side of the Picacho Mountains.  This area is ripe for

13  development.  We have the County planning indicating that this

14  is an area that's going to be developed.  This is the only

15  water sitting under his 1,100 acres that they now have.

16          Next.

17          Well, to sum up as to why I believe we're entitled to

18  summary judgment on the issue of offsets is that Lipin had

19  nothing to do with the deal between the Walkers and the

20  Parsons.  That's uncontested.  That's an uncontested fact.

21  That deal was struck so those fellows would have a continued

22  operation.  The deal was supposed to be that Walkers was going

23  to disclose for a new buyer.  He failed to disclose, and that's

24  what gave rise to the litigation.  All of it came about by

25  virtue of Walkers' wrongdoing.

1          Second, Lipin had nothing to do with Rothschild's bad

2    drafting.  In other words, it wasn't anything that he did or

3    contributed to the ambiguous easement or the cattle contract

4    between these two entities.  That's uncontested as well.  He's

5    also innocent of the title company's failure to insure clear

6    title.

7          Next.

8          And he's also innocent of First American Title's

9    failure to disclose the Clowdon (sic) title, and we haven't

10   gotten credit for any of those things, claim 13 must be

11   disallowed.

12         Go ahead.

13         So with respect to Walkers, our position is that the

14   Court should find the Walkers' judicial admission that FATCO

15   and GR owe the debt, not Lipin.  Secondly, find that Walkers

16   have been made whole, extinguishment of the easement problem is

17   settled, find that if the Court is not inclined to grant that

18   they've been made whole, to order disclosure of the 2008

19   settlement and allow us to monetize the value of the settlement

20   and present it as an offset.

21         In addition to the offsets, we want credit for our

22   water discovery, improvements affixed to the land, and would

23   also like the Court to find that 408 does not apply as a matter

24   of law.  Now, if that's too onerous for Mr. Walker -- or,

25   excuse me, Mr. Keating -- or if that's too onerous for Mr.

1   Loucks, then they have a choice.  They can disclose the

2   settlements to see if there has been actual credit that we've

3   been missed and not given, or they can withdraw their claims.

4   But they can't come to Court and claim that they haven't been

5   paid when they have, and they have.

6            Thank you, Judge.

7            THE COURT:  Okay.  Thank you.

8            Let's turn to the Respondents to see if there's

9   anything counsel wish to add to their papers, gentlemen?

10           MR. LOUCKS:  Any preference on who goes first, Judge?

11           THE COURT:  Not -- it's generally who stands up

12  first.

13       (Laughter)

14           THE COURT:  Mr. Loucks.

15           MR. LOUCKS:  Thank you, Judge.

16           THE COURT:  Perhaps a good way to begin, Mr. Loucks,

17  would be is there an undisputed fact -- is it an undisputed

18  fact that there are in existence setoffs to the Creditors'

19  claim?

20           MR. LOUCKS:  Is it an undisputed fact that there are

21  setoffs?

22           THE COURT:  Yes?

23           MR. LOUCKS:  It's very much disputed, Judge.

24           THE COURT:  Okay.

25           MR. LOUCKS:  But let me answer your earlier question

1 before I get back to that.

2         THE COURT: All right.

3         MR. LOUCKS: Parsons did not move for summary

4 judgment on the $190,800 business damages claim. The Court was

5 absolutely correct.

6         Parsons believes that there are questions of fact

7 that preclude entry of judgment on that, and the only thing it

8 moved for on its cross-motion for summary judgment was the

9 $265,000 sanction that the state court imposed on Lipan

10 personally.

11         THE COURT: All right. The -- I'll tell you frankly,

12 my notes indicated that that was part of the cross-motion, but

13 I can take it that there is no $190,800 portion of the judgment

14 on which this Creditor is seeking a cross-motion for summary

15 judgment?

16         MR. LOUCKS: Correct, Judge.

17         THE COURT: Noted.

18         MR. LOUCKS: Now I was relieved to hear when Mr.

19 Strohm stood up that some of the factual issues have been

20 clarified. For example, in the moving papers the Debtor states

21 -- I can't quote it because I don't have it in front of me, but

22 he states, "Lipin was not a party to the state court action,"

23 period.

24         So I was relieved when Mr. Strohm stood up and

25 presented the answer and showed that he indeed was a party to

1   the state court action.

2           The issue is not whether he was a party to any claim

3   brought by Parsons.  The issue is whether the state court had

4   jurisdiction over him personally, and by appearing as a party,

5   obviously the state court did have jurisdiction over him

6   personally.

7           And the reason I say -- I phrase it that way, Judge,

8   is because if you look at Parsons' judgment, it's two

9   components, and I've just touched on them.  There's one

10  component of $190,000 and change for lost business and business

11  damages, and that was assessed only against Mr. Lipin's LLC,

12  wholly owned, wholly directed LLC.

13          The other portion was a sanction, and this is the

14  other thing that I was glad that Mr. Strohm stood up and

15  addressed, because in his moving papers he states time and time

16  again Lipin was never sanctioned.  So it was a relief to me

17  when he just stood up and he said, and I'll quote him, "That

18  the state court hated his arguments and took it out on Lipin."

19          And that is exactly correct.  The state court hated

20  his arguments for six years, found that he had not proceeded in

21  good faith, found that he had primarily proceeded for the

22  purposes of delay, harassment, and increasing Parsons'

23  attorneys' fees.

24          It did not award Parsons attorneys' fees.  What it

25  did is it said, "I will sanction Mr. Lipin, and the basis of

1  the sanction will be the attorneys' fees he incurred."  There

2  is no separate award of attorneys' fees in Parsons' favor.

3         Now to get deeper than that, Judge, requires on any

4  level some sort of analysis that is prohibited by the

5  Rooker-Feldman doctrine.

6         And when we talk about what the easement was, when we

7  talk about what the claims were in the state court, every

8  attempt to go there is an attempt from the Debtor to pierce the

9  Rooker-Feldman doctrine.  And this Court has already said it

10 wouldn't do that.

11        But for example, one of the slides that Mr. Strohm

12 just put up, and forgive me for going out of order, Judge, on

13 page 15, pages 14 and 15 of his slides, Mr. Strohm was talking

14 about alleged malpractice by -- excuse me.  Was talking about

15 Parsons releasing its claim for about $47,000 against the

16 Walkers.

17        Going back to the state court pleadings, and Lipin

18 has already put this at issue in the moving papers.  He

19 admitted that in 2005 the state court found that the contract

20 he was talking about was not enforceable, so there was no

21 claim.  That was not the claim, $47,000 for the loss of the

22 property as a whole, because the Court found it wasn't

23 enforceable.  So, that in turn cannot be the basis of a

24 settlement.  Excuse me; of an offset.

25        Debtor has also pleaded in his papers or in his

1  moving papers that MCR had been negligent back in 1998, had

2  committed a malpractice back in 1998 by failing to obtain title

3  insurance for Parsons in that transaction.

4          And now he stands up before you and says, that may

5  have been in the past, but in fact it was Mr. Rothschild who

6  drafted an easement that was ambiguous.  That was never an

7  issue in the state court case, Judge, and that type of

8  allegation really requires a type of factual intensive inquiry

9  that this Court is not well suited for.  It requires going back

10  and piercing the state court judgment to figure out what was

11  going on in the state court.  And I asked the Court not to do

12  that.

13          Now one of the reasons of course for doing that is

14  that the state court judgment, if you read it, it says there

15  was a recorded judgment that Lipin was aware -- excuse me.

16  There was a recorded easement, that Lipin was aware of the

17  recorded easement, and the Court interprets the recorded

18  easement.

19          So, if there was an ambiguity, it had nothing to do

20  with his actions.  In fact, this goes to the one recovery rule.

21  Parsons agrees that there is a one recovery rule, but that's a

22  misnomer.  The one recovery rule says you can't recover the

23  same damages from multiple parties.  You can't have a windfall.

24          What is happening here though is Lipin admits and the

25  state court found that he blocked access against a recorded

1    easement.

2         Now the malpractice, for example, MCR, if it

3    committed malpractice, did not participate in blocking access

4    over that easement, did not participate in the six years of

5    conduct in the state court that has been found and cannot be

6    challenged to have been harassing.  It did not create any of

7    that conduct.  And the same thing could be said of Fidelity,

8    and the same thing could be said of the Walkers.  Only Lipin

9    chose to block access to the easement, and only Lipin chose to

10   harass Parsons in the state court, and because of that there's

11   a sanction.

12        There is not a single case cited to the court where

13   there has been an offset against a sanction.  Not a single one.

14        In fact not a single court case cited to the Court

15   where there has been an offset allowed post-judgment, and

16   that's what Debtor is seeking here.  There's no basis for an

17   offset.  There's no facts for an offset, and they're not

18   entitled to it on any ground.

19        Now I should have asked earlier, Judge, if the Court

20   had any questions raised from the prior presentation, but I'll

21   skip to that now.  Did the Court have any questions?

22        THE COURT:  I do not.

23        MR. LOUCKS:  Then let me just end on one thought,

24   Judge, and it occurred to me as I was preparing for this

25   argument that the Lipin is taking a double standard.  On the

1    one hand he argues, and the Court has already rejected this

2    argument, that he should not be responsible in any event for

3    the damages caused by his wholly owned LLC.

4          Now understanding that that's a factual issue for

5    Parsons' claim and is reserved to the future, it's disingenuous

6    of him to stand up and say, "Wait a minute.  Parsons can't get

7    the benefit of that but I can," but Lipin can.

8          And he says that because if Parsons only had claims

9    in the state court against AWD LLC, and it was ultimately a

10   sanction that hooked him personally in favor of Parsons, that

11   means that the attorneys' fees incurred in the state court were

12   incurred against AWD Farms LLC --excuse me, AWD Ranch, I

13   apologize for that -- which means that he's arguing for an

14   offset on issues incurred by a third party.

15         Now he did stand up here a minute ago and say, "I'm

16   entitled to $2 of offset for every dollar of offset on a deal,

17   some alleged deal, between Parsons and Walkers, which by the

18   way he admits -- he admits in his motion papers that there was

19   no 100 acre conveyance, but he stands up here and asks you for

20   a 100 acre conveyance so I'm confused about that.

21         But he says if there was a payment from the Walkers

22   to the Parsons on the dollar, I get credit for that, and if

23   there was a payment of a dollar from Parsons to the Walker in

24   the same settlement agreement I also get a dollar credit for

25   that.  And there's never been a case that allowed him, a third

1  party, to take two dollars credit for every one dollar at issue

2  between other settling parties.

3          So I think the Court, at least as indicated in its

4  preliminary ruling, balances a lot of interests here, and one

5  of those is walking the line of what Lipin has moved for in his

6  papers versus what actually happened in the state court, versus

7  what Mr. Strohm got up and said today which was clearly was not

8  representative, or not reflected, excuse me, in the state court

9  papers.

10          If the Court doesn't have any other questions for me,

11  I'll let Mr. Keating stand up.

12          THE COURT:  I have none, thank you.

13          MR. LOUCKS:  Thank you.

14          Mr. Keating, anything to add to your client's papers?

15          MR. KEATING:  Yes.  Thank you, Your Honor.  Kevin

16  Keating for the Walker creditors.

17          I'll try to be brief so that we don't repeat anything

18  here, but -- and I'm going to discuss some of the issues that

19  Mr. Strohm raised probably in the order that he raised them

20  because that's the way all my notes are going to be reading

21  here.

22          The -- he loves to talk about subject matter

23  jurisdiction and how he can keep raising subject matter

24  jurisdiction in 2013 -- but there was no issue of subject

25  matter jurisdiction in the court below, in the -- I mean, there

1   was, you know, statute of limitations defenses or not that they

2   waived.  There were other things that they could have raised

3   below, and there -- but there was never any question that the

4   court didn't have proper jurisdiction, subject matter

5   jurisdiction, to do what it did.  And that's just a contrivance

6   that he's come up with lately to try to fit other things into a

7   -- the category of subject matter jurisdiction when they don't

8   really fit.

9           Now -- and our main point of course is that the

10  offsets that he's talking about do not relate to the Walkers'

11  judgment that's the basis for the claim in this bankruptcy

12  matter.  The basis for the judgment is Lipin's fraud, and the

13  basis for the Walkers' claims in the tort below were Lipin's

14  fraud and, you know, its attempt to foreclose on the property

15  and get the property back because they failed to pay on the

16  promissory notes.

17          The fact that the Walkers and Parsons may have worked

18  out some sort of settlement, you know, way down the road in

19  2008 is, you know, totally irrelevant to the judgment that was

20  obtained in the superior court below by the Walkers.  It

21  doesn't help him make an argument about his fraud being less of

22  a fraud.  It doesn't help him go back and make payments on his

23  -- on his note so he can avoid foreclosure.

24          And of course we have to make sure we keep in mind

25  the fact that foreclosure did take place and the property was

1  foreclosed and it was ultimately recovered by the Walkers, so
2  he doesn't own it anymore, and none of his companies own it
3  anymore, and they haven't owned it for a long time.  And that's
4  important to a lot of, you know, issues that he keeps raising
5  as if he was still on the property.

6          And of course he's -- it's very wrong of him to unify
7  all the issues, I mean issues and claims in the Pinal County
8  case as if it was just one little thing.  There were a lot of
9  different claims as I just said, the foreclosure claim, the
10  fraud claim.  He had fraud claims that he lost against the
11  Walkers.  He had other cross-claims against the Walkers that he
12  lost, and, you know, none of those as far as the Walkers are
13  concerned related to the 1998 sale by the Walkers of certain
14  property to the Parsons.

15          This transaction in this case in the, you know, in
16  the Pinal County case, took place in 2002 when Lipin and his
17  colleagues there bought 1,100 acres from the Walkers.

18          And there was an easement on it, a cattle easement on
19  it at the time, and he knew about it.  That's what Judge Olsen
20  decided.  He knew about it then.  There wasn't any adjustment
21  to that easement.  The easement, the cattle easement was
22  determined to be a cattle easement and that he should have --
23  and he did know it and should have known the details of it and
24  should have acted accordingly back when he bought the property,
25  not that it's something that was struck, you know, thrust upon

1  him as a change in anybody's status in 2008 when that -- when

2  Judge Olsen decided that the easement was indeed a cattle

3  easement and that had always been a cattle easement.  And there

4  was no, you know, no change or discrepancy in that.

5        And he can't, you know, Lipin can't change -- claim

6  any benefit from the fact that Judge Olsen made a ruling on

7  that cattle easement that it was always a cattle easement and,

8  you know, if he acted wrongly at the time that he bought the

9  property in relation to that cattle easement, that's, you know,

10 I mean that was his problem.  He lost that already.

11       And now it -- again I'll -- sorry if I'm skipping

12 around too much here, but, you know, he talks about his request

13 for documents about the 2008 Walker Parsons settlement.  Again,

14 as the Court has noted, there was never any formal discovery,

15 and there wasn't really any informal request for discovery

16 either.

17       The only, you know, the only thing in there is by

18 implication in the summary judgment papers that we would have

19 objected, and that's true, you know, but if he's trying to

20 claim that there was even informal discovery, that's, you know,

21 that's false.

22       And there's certainly no admission anywhere in any of

23 the documents that any of the transactions or issues or byplay

24 here accounted -- amounted to an offset.

25       We don't believe there was an offset.  Nothing could

1   be categorized at an offset, and so it's not a matter of

2   accepting or not accepting it. There was just no offsets. And

3   that's always been our position, and I think it's pretty clear

4   from our papers that there was never any offset.

5           Now he talks about the value of the property now.

6   You know, it's preposterous to think that he would have wasted

7   so much time and energy thinking that this property might be

8   worth $5,000 an acre, or $15,000 an acre. I mean, if somebody

9   came along with an offer to buy that property at any of those

10  prices, you know, I'd make the trip to wherever that potential

11  buyer is and treat him to lunch, and we'd really talk seriously

12  about selling the property to whoever wants it.

13          There has never been any value placed on that

14  property. There's never been any -- anybody interested in

15  buying it. We -- it was advertised for sale as part of the

16  foreclosure process. Nobody bid. Nobody came in and said,

17  "Hey, I'll give you three cents an acre." Nobody said that.

18          And he didn't even come back and, you know, redeem

19  it. He had six months to redeem it. If it was worth all that

20  much money, why didn't he try to redeem it, you know, at that

21  time, you know, several years ago?

22          The offer, particularly at that stage of the

23  recession, the offer would have been met with a lot more, you

24  know, negotiation on the Walkers' part than it would be now.

25          But if it's worth -- if it's worth $500 an acre, you

1  know, that'd be a lot.

2        And of course as part of this settlement he's only

3  talking about there being in there a value, an amount of 100

4  acres, you know.  I mean, if -- nobody's going to buy 100 acres

5  in that part of the country -- you know, with no access.  I

6  mean, the Walkers don't technically have any legal access to it

7  either.  And it's not at all comparable to the Mesa property

8  that they, or, you know, own in Pinal County that they want to

9  sell in order to pay for the Cubs' ballpark.  You know, that

10  property does have value, and it's, you know, it's not

11  landlocked like ours.  It's not really near where ours is.

12        And of course his -- also his water discussions are

13  also fanciful.  There's water -- there's a lot of water on a

14  lot of property nearby, and that -- the fact that there's water

15  underground in Pinal County doesn't help us in trying to sell

16  the property that we have.

17        And also their claimed offset about where they came

18  up with a fanciful figure of 2.7 million being what's on the

19  property, what they put on the property?  You know, they

20  abandoned the property when they, you know, when they, you

21  know, lost the foreclosure action.  What was fixed to the land

22  or what they left there is, you know, it's not their, it's not

23  the Walkers' problem.

24        It -- I mean, it's the Walkers' problem in a negative

25  way, but it's not something that the Walkers look at with any

1  fondness and figure out, "Oh, gee, this adds value to it,"

2  because it doesn't.

3        They've despoiled the property.  It's worth less

4  because of it.  One of their group owns the 30 acre parcel

5  right next to it and that's, you know, they've claimed that

6  they have a separate kind of an easement of access across our

7  property, so that also, you know, diminishes the value of our

8  property.  If we tried to sell it we'd have to deal with that

9  issue.

10        The -- and of course most of the things in his paper

11  were things he's just raised today so I -- we probably, you

12  know, don't even need to spend too much time talking about the

13  value of these offsets, or the water issue or the other things

14  because he didn't really include them in any of his papers

15  here.  He included it in some other papers somewhere, but again

16  that's a fanciful idea that has no, you know, no relationship

17  to reality.

18        In the FATCO lawsuit, the lawsuit that Walkers have

19  brought against FATCO and Gust in Pinal County Superior Court,

20  that case is just in the pleadings stage.  FATCO hasn't

21  answered the complaint yet.  They filed a motion to dismiss and

22  that's pending.

23        The -- and so I don't know when that is likely to

24  have any kind of judgment that might determine how many -- how

25  much damages FATCO or Gust should have to pay to the Walkers,

1  but they haven't paid anything, and who knows what's going to

2  happen in that case.

3          I've made the argument in the -- in our papers that

4  if anything, it would be FATCO that might have an argument that

5  if Lipin pays the full amount that he owes to the Walkers and

6  then they're out of the, you know, out of the picture, they

7  don't have to worry because we've been made whole.

8          And I agree that we wouldn't, you know -- the Walkers

9  shouldn't get paid by both of them, but I want to make it clear

10 that in our papers we didn't say that Lipin is blameless.  Far

11 from it.  We talk about how we think and we allege that FATCO

12 and Gust, you know, were acting wrongly, and the damages that

13 the Walkers suffered are due to their actions as well.

14         But we didn't, you know -- we're not saying that

15 Lipin didn't have anything to do with it, and of course the

16 Court will have to determine that one way or the other anyway.

17 That's not -- it's not something that this Court is going to

18 make a judgment on based on my allegations in a case that's

19 just begun.

20         The -- the -- in the settlement between the Walkers

21 and the Parsons in 19 -- in 2008, I mean, there has been no

22 exchange -- I mean, you know, I'm fearful of saying too much

23 here because I, you know, don't want to disclose the details of

24 the settlement, but nonetheless there was a settlement, I

25 understand.  You know, I agree that there was a such

1    settlement.

2           But it wasn't anything that amounted to a grand

3    benefit to either side, and of course it's also wrong for Lipin

4    to say in any of his papers that the lawsuit below -- he didn't

5    say that today in his oral argument but in his papers, in his

6    motion, he talked about how the lawsuit in Pinal County was

7    begun by Parsons against the Walkers, as if the Walkers were

8    the major opponent or Defendant.

9           And they were just a, you know -- they were a

10   technical defendant because they had title to this property

11   that was involved in their claims against -- to get this

12   easement, this cattle easement declared to be a cattle

13   easement.

14          And, you know, in fact they, you know -- everybody

15   soon realized that Walkers and Parsons didn't have any beefs

16   against each other and so they didn't litigate against each

17   other during the course of that lawsuit after the, you know,

18   after the first short period of time.

19          And then when they settled it as a formal matter to

20   get rid of it, they got rid of it without any, you know,

21   without any -- it being any big deal.

22          And that was after the Court had decided that it was

23   -- that the easement was a cattle easement.  It was after the

24   Court had decided that it was going to order a foreclosure, so

25   it was clear right then that, you know, Lipin and Company were

1  not going to own that property anymore once the judgment was

2  actually prepared and filed and once the foreclosure sale was

3  actually, you know, actually took place.

4           And the -- you know, for them to, you know, concoct

5  all these arguments that they've been making the last, you

6  know, couple of months in this thing is -- is, I think it's

7  just silliness, and it's just them, you know, scraping around

8  for excuses and issues that they keep concocting but which most

9  of them they didn't, you know, didn't even think to bring back

10 in the court below.

11          And of course if they had brought them in the court

12 below, they would have lost them just like they lost every

13 other argument that they made down in the court below, and I --

14 and then they ought to, you know.  There's no reason why this

15 Court should go and re, you know, re-do stuff that the superior

16 court in Pinal County did.  That's all -- everything they want

17 to achieve in these actions is to try to, you know, re-do stuff

18 in the Pinal County case.

19          THE COURT:  Okay.  Thank you.

20          Mr. Strohm, you're itching to tell me something.  A

21 brief reply if you will.

22          MR. STROHM:  Very brief, Judge.

23          And first of all I think that Mr. Keating is

24 reinventing history here.  The litigation was begun by -- had

25 nothing to do with Lipin.  Litigation was begun in Pinal County

1 precisely because of this easement issue and the failure to

2 disclose the easement by the Walkers.

3          And it lasted five years.  It wasn't as if, as he

4 just said, there was no beef between Parsons and Walkers.

5 There was five years' worth of beef and probably close to a

6 million bucks in legal fees that were paid.

7          That early ruling, contrary to what Mr. Keating has

8 just told the Court, was in favor of the LLCs who purchased the

9 property, and there found that there was exactly no reason why

10 they should be -- they should not have claims against these

11 folks because the contract damages were there.

12          The 2005 contract was found to be enforceable as to

13 the Walkers but unenforceable as to Lipin.  And that's

14 important.  That's what Judge O'Neil decided.

15          Unfortunately what happened was the lawyer who had

16 the case at that time didn't record the judgment.  O'Neil's

17 first judgment was in favor of the purchasers.

18          Secondly with respect to Mr. Loucks' claim that, you

19 know, we're basically in a situation where we have a damages

20 that ought not to be credited to us.

21          I think Mr. Keating correctly conceded that were only

22 all of the Creditors entitled to one recovery.  If there's any

23 offset that is -- exists, we're entitled to get credit for it.

24          Mr. Parsons, the problem with Parsons is that the

25 damages were still running against them.  The damages would

1  continue to run.  Parsons' damages would continue to run for as

2  long as there was no settlement.  That settlement erased the

3  pleading.  They no longer had to pay those lost damages.  And

4  that's important.

5      Secondly, the offsets, when we're dealing with this

6  whole concept of offsets, we're not in Rooker-Feldman.  We're

7  no longer in Rooker-Feldman where we're looking to pierce a

8  judgment or to go behind the judgment and find out what's

9  realistic.

10      All we're trying to do is to say, "Okay, we've got a

11  judgment.  It's worth X."  These other parties involving the

12  same litigation have been paid so much, whether in kind or

13  whether in cash, and to the extent that there is a setoff,

14  we're entitled to it.

15      They won't disclose what the setoffs are.  They

16  concede there were settlements after five years and this whole

17  litigation went away that was begun with Walkers' wrongdoing.

18      If Walker can now stand up in court and say, "We

19  don't have to disclose," you're basically requiring Lipin to

20  pay for Walkers' wrongdoing by enforcing this judgment.

21      With respect to Mr. Walker's other claims, I

22  appreciate very much that he says that we're entitled to get

23  credit for a double recovery.  And he agrees, Mr. Keating

24  apparently agrees that Walkers, you know, should not be paid

25  double by both FATCO and Lipin.

1          Well, great.  That's a start.  That's a start.

2  That's a concession that hasn't been made until today.  We

3  appreciate that.

4          Finally I'd like to say that with respect to the

5  motion to dismiss in Pinal County, the motion to dismiss in

6  Pinal County from which I cited quotes on the response that was

7  filed by Mr. Keating, that case is a little further along.  I

8  don't know if even Mr. Keating is aware of it, but the Court

9  has already ruled in that case and has denied the motion to

10  dismiss that was brought by FATCO and joined by Gust Rosenfeld,

11  so as it stands the Court has accepted those allegations that

12  I've put up on the screen with respect to FATCO and GR.

13          And it's -- he's gotten past the motion for dismissal

14  on that, Your Honor.

15          Well, for all those reasons I'd -- for my lengthy

16  presentation this morning I apologize, but for all those

17  reasons I would appreciate it if the Court would reconsider and

18  look to these offsets as the proper and equitable thing to

19  allocate in favor of Mr. Lipin.

20          Thank you.

21          THE COURT:  Okay.  Thank you.

22          MR. KEATING:  Can I add quickly?

23          I didn't know about that decision that he just

24  announced, and I'm happy to hear that, but.

25          THE COURT:  Okay.  We'll note that as well, Mr.

1    Keating.

2         MR. KEATING:  He's keeping closer track of the case

3    than I am, I guess.

4        (Laughter)

5         THE COURT:  All right.

6         Gentlemen, I'm prepared to rule on this matter now,

7    and I'll do so.  Accordingly, anyone who wishes a complete copy

8    of my ruling and my reasons therefor may obtain it by ordering

9    either a transcript of this hearing or a compact disk

10   recording.

11        I'll start with the obvious principles since we're

12   dealing with two motions for summary judgment, which I believe

13   can be discussed together, as along with one cross-motion for

14   summary judgment.

15        Summary judgment, we all know, is appropriate only

16   when there is no genuine issue of material fact and the moving

17   party's entitled to judgment as a matter of law.  In ruling,

18   the non-moving party's evidence is believed.  All justifiable

19   inferences are drawn in that party's favor.

20        Movant bears the initial responsibility of informing

21   the Court of the basis for its motion, and identifying those

22   pleadings, depositions, answers, interrogatories, admissions,

23   together with affidavits which demonstrate the absence of a

24   genuine issue of material fact.  See the Supreme Court's

25   important Celotex Corporation decision, 106 Sup.Ct. 2548 at

1    2553.  And pursuant to Celotex, once the moving party has met

2    its burden, the opposing party then has the burden to come

3    forward with a more convincing showing that summary judgment is

4    not appropriate.  See the Bankruptcy Appellate Panel's Coleman

5    Oil Company decision, 190 B.R. 370 at 373.  This BAP opinion

6    was affirmed by the Ninth Circuit, 127 F.3d, 904.

7         The burden on the non-moving party is more than to

8    simply show metaphysical doubt.  Although inferences drawn from

9    underlying facts must be viewed most favorable to the party

10   opposing the motion, a non-movant must show the inference

11   favoring it is reasonable in light of competing inferences.

12        If the factual context renders a party's claim

13   implausible, that party must come forward with more persuasive

14   evidence than would otherwise be necessary.

15        This comes to us from the Supreme Court's Zenith

16   Radio Corporation case, 106 S.Ct. 1348 at 1356 to 57, or as our

17   Court of Appeals has phrased it, "A conclusory self-serving

18   affidavit lacking detailed facts and any supporting evidence is

19   insufficient to create a genuine issue of material fact."  I'm

20   reading from the Ninth Circuit's Caneva decision, 550 F.3d, 755

21   at 763.

22        And the burden of course is to apply these principles

23   to the present matters.  In the present case the Debtor here

24   believes that secret settlements have or may result in a double

25   recovery by these Creditors, and he further argues in papers at

1   least that the failure of these Creditors to report these other

2   sources of recovery means a false bankruptcy claim was filed,

3   or in the alternative that he's entitled to some type of an

4   offset.

5           This startling allegation of a false claim of course

6   is premised on the federal criminal statute, 18 U.S.C. § 152,

7   paragraph 4, which provides that a person who knowingly and

8   fraudulently presents any false claim against the estate of a

9   debtor under Title 11 shall be find or imprisoned or both.  But

10  although this is certainly a statute that attracts our

11  attention, the fact is that there is no private cause of action

12  arising from this criminal statute.  See the Heavrin decision,

13  246 F.Supp.2d 728 at 731.  See also bankruptcy case In Re

14  Anthony, 481 B.R. 602 at 627.

15          However, while there is no private cause of action

16  that can be premised on the criminal statute, there could still

17  be a basis for a civil sanction.  See a discussion by the

18  bankruptcy court in the Verona decision, 388 B.R. 705 at 711,

19  and also presumably there is a basis under Federal Bankruptcy

20  Rule 9011, but I think we're pursuing a false alternative when

21  we make these allegations based on a criminal statute.

22          A setoff created by a settlement, well, might be, but

23  the problem here is that there is little showing by the Debtor

24  as a matter of law that there is any knowing, and for that

25  matter fraudulent filing of a bankruptcy claim which could be

1  subject to a settlement setoff.

2  　　　　Just focusing on the setoff aspects of the Debtor's

3  motion, what's missing here largely is any real analysis of

4  Arizona law as to how to compute these setoffs other than a

5  reference to a single Arizona case affirming a right of setoff

6  of compensatory damages through a settlement, and that's the

7  Arizona Court of Appeals Regency Phoenix Hotel case, 907

8  B.R.2d, 506.

9  　　　　In that case this is what our State Court of Appeals

10 had to say in part:  "In Arizona a joint tort feasor is

11 entitled to have the amount of another joint tort feasor's

12 settlement applied in reduction of the Plaintiff's claim."  See

13 909 P.2d at 524.

14 　　　　But how does that help us here?  Are bankruptcy

15 creditors joint tort feasors?  I doubt it.  Does the statue

16 that's implicated in this decision, A.R.S. 12-2504, even apply?

17 I can't see how it does.  It provides in part:

18 　　　　　　"If a release or covenant not to sue is given in

19 　　　　　　good faith to one of two or more persons liable

20 　　　　　　in tort for the same injury or the same wrongful

21 　　　　　　death, it does not discharge the other tort

22 　　　　　　feasors from liability for the injury or

23 　　　　　　wrongful death, but it reduces the claim against

24 　　　　　　the others to the extent of any amount

25 　　　　　　stipulated by the release, and it discharges the

1          tort feasor to whom it is given from all

2          liability for contribution to any other tort

3          feasor."

4     I just don't see with respect how the citation of

5 these authorities helps -- has clearly established that this

6 statute applies to reduce judgments that were obtained in the

7 state court against the Debtor in favor of these Creditors, and

8 I can't see how concepts of joint tort feasors and wrongful

9 death causation are helpful as well.

10         Is there such a thing as a setoff to a bankruptcy

11 claim?  Of course there is, but the setoff has to be

12 established.  If, and additionally, if the Debtor was aware of

13 earlier settlements, then he may well be too late to be

14 asserting them as setoffs to bankruptcy claims.

15         The, again, the State Court of Appeals has noted:

16         "Public policy demands there be an end to

17         litigation.  The common good requires that there

18         be an end to strife for the purpose of producing

19         certainty, and thus a defendant requesting the

20         court to apply the amount of another joint tort

21         feasor's payment to reduce a plaintiff's claim

22         should do so before the judgment is entered."

23 Again, that's from Regency Phoenix at pages 524 to 25, so that

24 even if this case applied as the Debtor apparently thought it

25 did, there's a caution here that such matters have to be raised

1    before the judgment is rendered.

2          I really am required to deny the Debtor's motions for

3    summary judgment against these two Creditors because we have

4    had a great deal of speculation and then suspicion but no

5    establishment as a matter of material undisputed fact, or for

6    that matter as a matter of law, that these Creditors filed a

7    false claim, or even that the Debtor has some setoff rights as

8    a result of any settlement.

9          The one Creditor, The Parsons Company, filed a

10   cross-motion for summary judgment asserting it's entitled to

11   summary judgment on the issue of the validity of the state

12   court judgment against the Debtor, and here's what I've already

13   done on these issues by a previous ruling that I entered, and

14   my ruling provided in part the Debtor's collateral attack on

15   The Parsons' judgment falls short for three reasons.

16         First, Movant filed a state court Rule 60(c)(4)

17   motion claiming the judgments were void and making essentially

18   the same arguments made here, and the motion was denied.  The

19   Debtor appealed, but the Debtor subsequently dismissed his

20   appeal.

21         Second, the Movant raised similar arguments in

22   district court and lost before Chief District Judge Silver in

23   District case 11-1599.  In dismissing the Plaintiff's first

24   amended complaint, the chief judge focused at least in part on

25   the Rooker-Feldman doctrine that was, that's an important focus

1   because the fact of the matter is <u>Rooker-Feldman</u> bars --

2   implicates bankruptcy judges as well as district and circuit

3   judges.

4          This is what the chief district judge said in that

5   case:  "Federal district courts lack jurisdiction to review

6   state court orders of judgment.  This Court," the district

7   court continued, "lacks jurisdiction to review the Pinal County

8   Superior Court's judgments and orders."

9          And a third basis for not revising, I ruled, the

10  Debtor's collateral attack on The Parsons' judgment, and for

11  that matter on the Walker judgment as well, is the Movant's

12  pre-trial conduct.  At least in The Parsons case the Defendant

13  objected to considerations of certain issues at trial.

14         The Defendants had notice.  They actually provided

15  notice they didn't intend to appear at the state court trial.

16  They were as good as their word.  The state court determined

17  not to continue the trial, and since the Defendants didn't

18  appear, a unilateral joint pre-trial statement was filed and

19  the trial was conducted with the Defendants not in attendance,

20  and that's resulted in a judgment being entered against the

21  Defendants including Mr. Lipin.

22         I continued in my earlier ruling:

23         "It seems this collateral attack on the judgment

24             comes too late.  The Defendants chose not to

25             defend at trial.  After losing, they filed a

1                    Civil Rule 60(c)(4) motion.  They lost that.

2                    They appealed.  They dismissed their appeal.

3                    The Defendants took a second route to avoid the

4                    judgments by going through the district court,

5                    and that was also unsuccessful.  So the Debtor

6                    has had ample opportunity to collaterally and

7                    directly attack the judgments."

8      And I concluded in my ruling:

9                    "This Court will reject the collateral attack

10                   and simply look at the judgments and determine

11                   if they form a basis for non-dischargeability in

12                   bankruptcy.  For these reasons the Debtor's

13                   claim objections, based on the same arguments,

14                   is overruled."

15                   I've been reading from my prior ruling from the

16     transcript at pages 3 to 9.

17                   Or course what we have here today is not a discussion

18     in an adversary proceeding of non-dischargeability but rather

19     the Debtor's attack on these judgments.  But these claims

20     objections, originally premised by attacking the judgments

21     themselves, have been entirely resolved, and the only issue

22     that may be remaining is the Debtor's contention that he was

23     not a named party in Pinal County litigation.

24                   He notes that the court found, "AWD Ranch LLC, and

25     Desert Plants Conservancy LLC caused Parsons' damages."  And

1   see the judgment attached to The Parsons proof of claim.

2          However, the state court found that Mr. Lipin and

3   others be jointly and severally liable in the amount of some

4   $265,475 in fees awarded to The Parsons, and accordingly when

5   the Debtor filed a motion to alter the Court's judgment, noting

6   that he was not personally assessed at least the $190,800

7   portion of the claim, that that motion is -- was at Docket 235.

8          This is what The Parsons had to say in response to

9   that claim objection in part:

10          "There is no dispute the judgment specified the

11          $190,800 portion of Parsons' claim was a

12          judgment against Lipin's entity ranch and not

13          against him personally.  Parsons filed his claim

14          against Lipin upon information and belief that

15          any assets and debts of the company were

16          distributed to Lipin when Ranch ceased its

17          business.

18          "Evidence in adversary proceeding 11-2300 will

19          show,"

20   the Creditor continued,

21          "...Lipin collaborated with Creditor AWD Farms

22          LLC to pierce Ranch's corporate veil.  Parsons

23          only seeks equal treatment of its dischargeable

24          claim.  If an investor in the Debtor's business

25          such as AWD Farms LLC not only can elevate its

1            claim from an equity claim to a general

2            unsecured claim but also pierce the corporate

3            veil to allow for a personal claim against

4            Lipin, then at a minimum Lipin should be charged

5            with administering the estate in an equitable

6            manner to -- as to all claimants."

7     And frankly I took the papers filed in the cross-motion as a

8     summary judgment on this $190,000 claim component as well.

9            But, I've been assured by Counsel that this is not

10    the case, and that's a good thing because I would not grant the

11    cross-motion for summary judgment as to the $190,800 portion of

12    the judgment.  But the way things stand today, I think the

13    remainder of that claim is well supported by the judgment, and

14    if it's anything we've learned from this extended litigation,

15    it's that I am not going to revisit any judgment so in part I'm

16    going to grant The Parsons' cross-motion for summary judgment,

17    but as to the legitimacy of its claim but not as to the

18    $190,800 portion as well.  And I think a similar result occurs

19    as to the estate of Walker as well.

20           Yes, claims, even claims established by valid

21    judgments, are subject to a setoff.  Yes, creditors are not to

22    be paid twice for the exact same claim.  We know all these

23    things, but that's really all I know about the facts argued by

24    the Debtor in these summary judgment motions.

25           If I had to summarize my ruling -- I'm obviously

1    going to deny both summary judgments of the Debtor -- if I had

2    to summarize my ruling, I would say this.  Suspicions and

3    speculations are an insubstantial basis on which to formally

4    object to a bankruptcy claim, or for that matter even to argue

5    that a shifting of the burden of proof with regard to the

6    properly filed proof of claim has been filed.  And this is

7    applicable to both of these Creditors' claims.

8        Now this Debtor had and has the tools, such as

9    Bankruptcy Rule 2004, to investigate any possible setoffs to

10   the proof of claim and -- but that's what should occur first,

11   and those facts should be adduced and the setoff liquidated

12   before we file motions for summary judgment on legal theories.

13       So I -- the best I can agree with Mr. Lipin is he's

14   exactly correct.  Creditors can't have a windfall.  They can't

15   be paid twice.  But really, that's where I find myself --

16   that's the, basically the extent of my agreement with Mr. Lipin

17   at least on these two motions, so that's why I'm denying both

18   motions for summary judgment on this matter.

19       So, the summary judgments are resolved.  The

20   objections to claims 12 and 13 are resolved.  However, I think

21   a motion has been filed and we've got a hearing pending, do I

22   recall, in March, gentlemen, on the Debtor's motion there?

23       MR. STROHM:  Yes, sir, March 15th.

24       THE COURT:  All right.

25       Let's have the courtroom deputy remind all of us of

1   that date and time?  We think it's March 15th.

2           THE CLERK:  It is March 15th, but that date will be

3   rescheduled because the Court's not available that day.

4           THE COURT:  Okay.  I'm -- apparently I'm -- oh,

5   that's right.  I'm fleeing the jurisdiction so the gentlemen

6   are going to hear from me with an amended order that resets

7   that hearing, and my apologies for that.

8           So that completes these matters on April -- besides

9   this March hearing, which isn't going to happen.

10          We also have a date on March 2nd at 9:30 for another

11  Chapter 11 status hearing and a status hearing in Adversary

12  11-2300.  And I suggest, gentlemen, we have exhausted each

13  other, so I think we should adjourn.

14          Good afternoon.

15          MR. STROHM:  Thank you, Your Honor.

16          MR. KEATING:  Thank you, Your Honor.

17      (Proceedings Concluded)

18

19

20      I certify that the foregoing is a correct transcript from

21  the record of proceedings in the above-entitled matter.

22

23  Dated: February 21, 2013          *Harold Zerguson*
                                       AVTranz, Inc.
24                                     845 North 3rd Avenue
                                       Phoenix, AZ  85003
25